GREGORY DRIEKOSEN, APPELLEE, V. BLACK, SIVALLS &
BRYSON, INC., A CORPORATION, ET AL., APPELLANTS.
64 N. W. 2d 88

Filed April 16, 1954.   No. 33449.

*Maupin & Dent* and *Edwin D. Crites*, for appellants.

*John H. Keriakedes* and *Perry & Perry*, for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

CHAPPELL, J.

Plaintiff Gregory Driekosen brought this action against defendants Black, Sivalls & Bryson, Inc., hereinafter designated as B. S. & B., and Dale O. Larson and Charles H. Brown, Jr., doing business as Larson and Brown Equipment Company, a partnership, hereinafter designated as L. & B., or the partners, seeking to recover substantial damages resulting from the explosion of an installed propane gas system sold to plaintiff and alleged to have been negligently installed by defendants in plaintiff's home. The action was specifically alleged to be and was ex delicto in character.

For his cause of action plaintiff alleged, insofar as important here: That defendant B. S. & B. was engaged in the manufacture, wholesale, and distribution of pressure vessels, fittings, piping, and related merchandise for the sale and installation of propane gas systems

for the furnishing of heat and power, and that its authorized dealer, defendant L. & B., was engaged in retailing said equipment and merchandise and installing the same, and in the sale of propane gas for use therein. That defendants knew or should have known that propane gas to be used in the equipment for its propane gas system so furnished by them was a dangerous substance, having volatile and explosive characteristics, and defendants knew or should have known that if such gas were permitted to leak from any part of said system it would follow along any submerged pipings or fittings into the residence of persons using such gas and system. That on or about November 5, 1947, after defendants had been informed by plaintiff of the purposes for which it was to be used, plaintiff purchased from L. & B. as authorized dealer for B. S. & B., a complete B. S. & B. propane gas system, which was installed by L. & B. in his acreage home about 1 mile south of Hay Springs, Nebraska. That at time of purchase and installation thereof and prior thereto, defendants each, for the purpose of inducing plaintiff to purchase and install such propane gas system, orally, expressly, and falsely represented that said system was constructed of long-lasting, top-quality materials, and that their skilled workmen L. & B. would provide the necessary fittings and copper tubing and do all the work of skilled installation. Further, also, that during the late summer and fall of 1947, defendants and each of them cooperated and joined in causing to be published a series of advertisements in the Hay Springs News respectively therein representing the quality, safety, and adequacy of such a system, for the purpose of inducing plaintiff and others to purchase B. S. & B. propane gas systems from them. That plaintiff relied upon defendants' representations aforesaid, and their skill and judgment in the purchase and installation of the system, but, without warning plaintiff of the danger involved, they negligently installed it in such manner that it was unsafe and de-

fective because the piping was unfit for the purposes and soil in which it was laid, and was not fit for the purposes for which it was sold to defendant, and the piping and system were negligently and improperly installed, which caused the piping to corrode, rust, and fall apart, thereby permitting the dangerous propane gas supply to be discharged therefrom into his residence at a point underground, beyond plaintiff's ability to observe or anticipate. That as a direct and proximate result of such negligence and unlawful acts, propane gas was discharged from the system into plaintiff's residence in such quantities that on May 22, 1949, the gas became ignited, exploded, and completely destroyed and burned plaintiff's residence and its contents, caused his wife to suffer severe burns over her entire body which required medical and hospital care and caused her death on May 24, 1949, and caused his two minor daughters and a minor son to be severely burned and injured, requiring medical, hospital, and nursing care. Plaintiff prayed recovery from defendants of such sum as would reasonably compensate him for his damages, to wit, the loss of his residence and its contents; the medical and hospital expenses for his wife; the necessary funeral and burial expenses for her; the loss of her consortium; and the hospital, medical, and nursing expenses for his children.

Defendant B. S. & B. answered, admitting that it was a corporation authorized to do business in this state; that a fire occurred in plaintiff's residence owned by him on May 22, 1949; that plaintiff's wife died on May 24, 1949; and that plaintiff was at that time the father of two minor daughters and a minor son. Otherwise, it denied generally and alleged that the burning and destruction of plaintiff's residence and contents, the death of plaintiff's wife, and injuries to his children, were solely and proximately caused by the negligence of plaintiff and his wife and parties other than said defendant, and that the negligence of plaintiff and his wife was more than slight

as compared with the negligence of said defendant. Defendant L. & B. filed an answer comparable in material respects with that of defendant B. S. & B. except that it set forth and charged specific allegations of negligence by plaintiff and his wife, which we do not deem it necessary to repeat here. Both defendants prayed for dismissal and costs.

Plaintiff's reply to such answers, insofar as important here, denied generally all material allegations therein which did not admit the allegations of his petition, and renewed the prayer of his petition.

Upon the trial of such issues to a jury, whereat voluminous evidence was adduced, it returned a verdict for defendants, and judgment was rendered thereon. Thereafter, plaintiff's motion for new trial was sustained, the verdict and judgment were set aside, and plaintiff was granted a new trial primarily upon the ground that instructions Nos. 9 and 16 with relation to contributory negligence given by the court, did not correctly state the law as to all items of damage claimed by plaintiff and were prejudicial to the claim of plaintiff or a portion thereof.

From such order and judgment defendants appealed to this court. They filed separate briefs. However, each assigned substantially, but in somewhat different language, that: (1) The trial court erred in granting a new trial upon the ground that instructions Nos. 9 and 16 were prejudicially erroneous; and (2) in any event the trial court erred in failing to sustain their respective motions for directed verdict made at the conclusion of plaintiff's evidence and renewed at conclusion of all the evidence, upon the ground that plaintiff had failed to establish by any competent evidence that defendants were negligent or that any negligence on their part was the proximate cause of the explosion and damages. Therefore, they argued that the verdict of the jury for defendants was the only one that could have properly been awarded as a matter of law under the pleadings and

evidence, so there could have been no prejudicial error in the manner in which the case was submitted to the jury. We conclude that the assignments should not be sustained.

At the outset defendants argued that plaintiff erroneously relied in his petition upon a double theory of liability, that is, in tort for alleged negligence by defendants and also in contract for alleged breach of either an express or implied warranty. Rather, as we view it, plaintiff's action was simply one for negligence in which he relied upon express oral and written representations made by both B. S. & B. and L. & B., in order to directly and expressly fix the duty imposed upon them by law which they were required to properly perform without negligence when for an agreed paid price they furnished and installed the system.

With regard to plaintiff's petition, it is said in 1 Am. Jur., Actions, § 50, p. 442: "The character of an action as one in tort or one ex contractu must be determined by the nature of the grievance, rather than by the form of pleading. Consideration must be given to the facts constituting the cause of the complaint." As stated in 1 Am. Jur., Actions, § 51, p. 443: "It is also well-settled law that one may sue in tort when there has been negligence in the performance or nonobservance of a contract, and not in contract, as the injury in such a case results, not from a breach of contract, but from negligence in the performance of it; for accompanying every contract is a common-law duty to perform the thing agreed to be done with care, skill, reasonable expediency, and faithfulness, and a negligent failure to observe any of these conditions is a tort as well as a breach of contract." See, also, 52 Am. Jur., Torts, § 27, p. 380, § 102, p. 442.

As stated in 52 Am. Jur., Torts, § 26, p. 379: "Where a contractual relationship exists between persons and at the same time a duty is imposed by or arises out of the circumstances surrounding or attending the transaction, the breach of the duty is a tort. In such case, the tor-

tious act, and not a breach of the contract, is the gravamen of the action; the contract is the mere inducement creating the state of things which furnishes the occasion for the tort."

In 46 Am. Jur., Sales, § 802, p. 928, it is said: "The theory most frequently invoked as the basis of the liability of the seller of an article for personal injuries to the buyer resulting from a defect in or the defective condition of the article sold is upon the ground of negligence, and in such cases it is of course necessary to establish the elements of actual negligence, namely, a breach of duty on the part of the seller toward the person complaining of the defect, and an injury to the person to whom that duty is owed proximately resulting from the breach of duty on the seller's part."

In the light of defendants' other contentions, we turn to a discussion and disposition of their assignments. In doing so, we have in mind the elementary rule that a motion for directed verdict must, for the purpose of decision thereon, be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed, who is entitled to have every controverted fact resolved in his favor and have the benefit of every inference that can reasonably be deduced from the evidence.

Also, as held in Kuska v. Nichols Construction Co., 154 Neb. 580, 48 N. W. 2d 682: "In a jury case involving issues of negligence, where different minds may draw different conclusions or inferences from the evidence adduced, or if there is a conflict in the evidence, the matter at issue must be submitted to the jury, but where the evidence is undisputed, or but one reasonable inference or conclusion can be drawn from the evidence, the question is of law for the court.

"If the original negligence is of a character which, according to the usual experience of mankind, is liable to invite or induce the intervention of some subsequent cause, the intervening cause will not excuse it, and the

subsequent mischief will be held to be the result of the original negligence." See, also, Wax v. Co-Operative Refinery Assn., 154 Neb. 42, 46 N. W. 2d 769, wherein it was held that: "A party is only answerable for the natural, probable, reasonable, and proximate consequences of his acts; and where some new efficient cause intervenes, not set in motion by him, and not connected with but independent of his acts and not flowing therefrom, and not reasonably in the nature of things to be contemplated or foreseen by him, and produced the injury, it is the dominant cause.

"In an action based on negligence the question of whether or not there was an intervening cause which removed the negligence of the defendant as the proximate cause is usually one for a jury."

The evidence is in many material respects in conflict, but the record discloses competent evidence from which it could reasonably be concluded as follows:

During the summer, in July and into the fall, until about October 20 or 25, 1947, plaintiff had several conversations with one of the defendant partners at their place of business and in plaintiff's home, wherein this partner attempted to convince plaintiff that he should purchase an installed B. S. & B. propane gas system in plaintiff's home. Some of such conversations followed and referred to the appearance, wording, and plaintiff's reliance upon certain advertisements in the Hay Springs weekly newspaper, which were read and relied upon by plaintiff and his wife. In that connection, B. S. & B. furnished and prepared mats for such advertisements which were forwarded by them to L. & B., who published them. One such conversation aforesaid was with a factory representative of B. S. & B. and one of defendant L. & B. partners, its authorized dealer, who were both present at the time the conversation took place in Hay Springs.

Insofar as important here, the conversations were as follows: Plaintiff stated to the partner that he wanted

"'a good substantial system put in.'" With regard to the B. S. & B. system, the partner said: "'We got one of the best.' * * * 'We are dealing with a good, reliable outfit, and an old, established outfit that has years behind them of making' * * * compression vessels * * * or equipment . * * * a good, reliable, dependable system * * * it's a life time system." With regard to the installation, the partner promised that it "would be put in good, with all the proper copper and fittings so it would work right and do a good job * * *." It would "'be put in good and safe.'"

The factory representative of B. S. & B. told plaintiff "they have an established and have an advertised system * * * in the local territory, and they got their parties here established in business, which is going to take care of the people that buy their system, and they will be responsible, skilled, good installation; and as in case * * * something goes wrong, you can always call your local man to check, repair and fix those." Plaintiff said to him, "'The way your ad reads, it would be a good installation; * * *.'" To which the representative replied: "'We have got our men here, * * *. Our skilled, good installation workers.' * * * 'We got stations' * * * 'Wyoming, Nebraska, Kansas.' * * * 'We ain't just a small outfit.'"

All of the advertisements, the mats for which were prepared by B. S. & B. and furnished to L. & B who published them, first conspicuously headlined the merits of the "BS&B Propane System" and had a conspicuous, attractive, seal-like design or trademark thereon, stating that L. & B. was an "authorized BS&B dealer."

Insofar as important here, the first advertisement also said: "BS&B Propane systems are constructed of long lasting, top quality materials by one of America's oldest pressure vessel manufacturers. Come in today . . . let us help you tailor your Propane System to fit your needs, the BS&B way. * * * Clean, healthful heat all over the house * * *. Warm and safe, regardless of weather

. . . automatically! * * * Let Us Show You . . . Come in Today!"

The second advertisement said: "Look for the superior BS&B features when you buy . . . X-ray perfect, double-welded seams, hydrostatically tested, dehydrated and sealed against moisture. Each System includes BS&B Tank, necessary fittings and copper tubing to the installation. Our skilled workmen do all the work. Put a BS&B Propane System at the top of your improvement list now!"

The third advertisement said: "BS&B Propane Systems last a lifetime. Provide a 'gas well' in your back yard! The BS&B trademark is your assurance of perfection in design, weld, and fittings."

The fourth advertisement said: "Remember, Propane gas does it better because * * * It's safe * * * You are welcome to use our knowledge and experience in helping you achieve a really modern home . . . the BS&B Domestic Propane Gas way."

The fifth advertisement said: "Use modern tested methods in cooking, baking, canning. Do it better, do it easier . . . with your new automatic kitchen range and a BS&B Domestic Propane Gas System. Let us show you how easy it is for you to live the modern way . . . starting now! * * * No unpleasant fuel odor."

Plaintiff was induced by the aforesaid representations and defendants' skill and judgment upon which, as they well knew, he relied, to purchase the B. S. & B. system from L. & B. sometime between October 20 and 25, 1947, and it was installed by them in his home. In doing so they furnished a hot water heater, a furnace, and a gas supply tank, together with the necessary fittings and copper tubing to connect the tank to them and a gas stove already owned by plaintiff, which was located on the first floor. The hot water heater and furnace, located in the basement, had automatic shut-off pilot lights, and about 1½ or 2 weeks before the explosion, the furnace had been completely shut off and

disconnected by one of the L. & B. partners. B. S. & B. furnished L. & B. collect several gas tanks and related equipment, including 1,000 feet of identical copper tubing in July 1947, but whether or not any part of such tubing was used in plaintiff's installation could not be definitely ascertained, although not denied by defendants, since the copper tubing used was taken out of .L. & B.'s warehouse in original packages where they had theretofore stored some such tubing purchased elsewhere. However that question as we view it is not controlling here.

About October 20 or 25, 1947, plaintiff left Hay Springs to visit his father who was ill in another state, and when he returned on November 5, 1947, the system had already been installed by L. & B., except for a few minor details. Its installation was supervised by one of the partners who was a college-trained civil engineer. When installing the system, they placed the supply tank above ground in plaintiff's back yard, about 24 feet from his residence. They connected the tank and the residence with 99.93 percent copper tubing, a product authorized to be used by Rule B-7 (a), p. 47, 1945 Laws, Rules, and Regulations, Department of Fire Prevention, State of Nebraska, promulgated and distributed by the State Fire Marshal, which contained standards for the storage and handling of liquified petroleum gases. Such tubing, however, was not first insulated by L. & B. or B. S. & B. to prevent corrosion, as required by good safe practice generally known and practiced for many years, and in such condition the pipe was buried underground up to about 6 or 8 inches from plaintiff's residence at a depth of only about 14 inches, in violation of rule B-7 (g), p. 48, of the rules and regulations aforesaid, which required that it "shall be buried below the established frost line and *in no case less than 2 ft. below ground unless otherwise protected.*" (Italics supplied.) True, there is no rule of the department which specifically says that piping buried underground shall be first in-

sulated against corrosion, but rule 2.20 (e), p. 69, requires that "Underground containers" shall be appropriately insulated to prevent corrosion before lowered in place underground; and the State Fire Marshall who testified for plaintiff not only said that "Underground containers" were intended to and did include underground piping, but that also in any event it was a well-known, recognized, good practice to insulate the piping in order to prevent corrosion and otherwise protect it.

Within 6 or 8 inches of plaintiff's residence, L. & B. brought the copper piping up through loose dirt and connected it through the wall into plaintiff's residence, thence to the respective household facilities heretofore described. When the installation was completed, one of the partners told plaintiff, " 'If anything goes wrong, don't fool with it, call us. That's what we're here for.' " In speaking of that statement, plaintiff said, "That was my orders," and he obeyed them. Such statement was not denied by defendants.

Plaintiff had a little trouble with the system a couple of times, whereupon he immediately called L. & B., who responded and remedied the trouble. For example, the pilot light on the furnace went out, whereupon L. & B. were called and one of the partners adjusted and lit it again. At another time they replaced some automatic parts on the furnace and lit it, and it worked again. At another time, about 1½ or 2 weeks before the explosion, the furnace door blew off, so one of defendant partners was called at once, who came out and shut off the furnace, and it remained shut off and disconnected thereafter up to and including the time of the explosion on May 22, 1949. One of plaintiff's daughters testified that the furnace door also blew off at another time, but when is not shown. Plaintiff bought his propane gas supply from L & B. until they sold out their business. He then bought the last two or three lots from others, and gas had been placed in the tank by them only a day or two before the explosion, but there is no evidence or contention

here that they were at fault in any manner:

No member of the family had smelled any odor of gas in the house at any time or had any warning thereof prior to the explosion, and in that connection the night before the explosion plaintiff's two daughters slept in a room partitioned off in the basement. They were in fact asleep there at the time of the explosion, which awakened them, and they discovered that their room, clothing, and bed were in flames.

On Sunday morning, May 22, 1949, plaintiff and his wife got up and had coffee together about 7 a. m. Plaintiff then went down in the basement after his milk pails and came up again without noticing any odor of gas or having any warning of danger. As he was leaving the house he passed his wife who was going down into the basement to perform some morning household duties. There she struck a match to light a wood and coal range in the basement, or to burn some trash therein, and when plaintiff was 35 or 40 feet from the house, the explosion occurred. It occurred with such force that it knocked plaintiff to the ground, was heard by people three-quarters of a mile distant, raised up and twisted the house off its foundation, set it on fire, destroyed it together with its contents, and severely burned and injured plaintiff's wife and children. Friends and neighbors came almost at once, knocked down a door in order to remove one of the children, and took the wife and children to a physician where they received first aid. They were then removed to a hospital where the wife died and the two daughters were treated for 27 days, after which they required medical and nursing care for some time.

We find no competent evidence in this record from which it could have been reasonably concluded that either plaintiff or his wife was guilty of any contributory negligence. Certainly it was not negligence for plaintiff's wife to strike a match in the basement of her own home when there was no previous warning of danger.

In that connection, defendants produced a witness who testified that about May 8, 1949, he was working in plaintiff's home and basement in preparation for connecting up and converting to R. E. A. electric current, which was never in fact actually connected or converted. Such witness testified that he smelled no gas in the house, but he thought that he and other men working there had suggested to plaintiff that he should have the system checked because in their opinion there was gas present. However, he did not remember the details of the conversation, and as he recalled it, "I think they were all together there" but "I have no definite memory on it, no." Further, plaintiff denied that there ever was any such conversation with him.

One of the other workmen there was also called by defendants. He testified that on or about May 7, 1949, he smelled gas in the house. However, it was while he was up on a ladder right against the pipe connection. There he could smell a slight odor of gas but when he moved his face a short distance away he could not smell it. He testified that the men working there talked about such gas, but in that connection he said, "I just don't remember whether we mentioned it to Mr. Driekosen or not. I'm sorry, but I just don't remember that we did or we didn't. I know we talked of it and said we should inform him; now, whether we did, that part I couldn't swear to."

It will be recalled also in that regard that a defendant partner, a civil engineer with college training, was in plaintiff's basement and shut off the furnace at about that same time so if there was gas escaping there he should have known about it, but he testified that he had no warning of any leakage of gas in plaintiff's basement, and made no claim that he ever warned plaintiff or plaintiff's wife of any danger thereof. As we view it, any submission of any issue of contributory negligence of either plaintiff or his wife by instructions to the jury, as was done in this case, would, under the

circumstances appearing in this record, be erroneous and prejudicial to plaintiff. It is now elementary that: "Where contributory negligence is pleaded as a defense, but there is no evidence to support such defense, it is prejudicial error to submit such issue to the jury." Allen v. Clark, 148 Neb. 627, 28 N. W. 2d 439. Also, to do so requires "the granting of a new trial." Remmenga v. Selk, 150 Neb. 401, 34 N. W. 2d 757. Such statement and authorities dispose of defendants' first assignment. We conclude that it has no merit.

A day or two after the explosion and fire, plaintiff, the fire chief, and a fireman dug up 3 or 4 feet of the copper tubing buried about 14 inches underground, beginning at a point 6 or 8 inches from the house, and found that the tubing was corroded, disintegrated, and porous, with numerous holes through it from the outside inward, ranging from infinitesimal to as much as ½ inch in size. The pipe was not corroded on the inside. A piece of it more than 1 foot long, offered by plaintiff and properly received in evidence, appears in the record. One piece of that removed was given to the fire chief, and the one received in evidence, together with a sample of soil taken from the point where the pipe was buried, was sent by registered mail to an expert, Mr. W. F. Weiland, a registered professional engineer and full professor of mechanical engineering at the University of Nebraska. Such witness had specialized for more than 30 years, and in doing so had made research of metals, fuels, lubricants, combustion, explosions, and corrosion. He made a scientific analysis of both the soil and tubing with relation to the reasons for its corrosion and disintegration. He thus found that the soil, similar in material respects with several other soils tested by him throughout other parts of Nebraska, contained organic matter, and carbonates, which when liberated gave off carbonic acid; that it also contained iron oxide; and that as an established fact, generally known long prior to 1947, in the decaying process in the presence of water it

evolved volatile, corrosive, organic acids very rapidly chemically corrosive to copper buried as it was here, which, in conformity with good practice generally recognized and used, could have been prevented either by cathodic protection or by insulation with numerous recognized materials generally used for that purpose, which, as long as intact, would keep the copper tubing in good condition with a life expectancy of as much as 50 years. Otherwise it would corrode and fail in any period up to 2 years, dependent upon the extent of alternate wetting and drying of the soil.

He testified that propane gas, odorless in its natural state but generally odorized, was not toxic but was asphyxiating, and that it was a highly dangerous, explosive product with a low limit of inflammability which, with only about 2 cubic feet of it in 100 cubic feet of air, will explode or burn if ignited in any manner.

After foundation was laid therefor, the witness, in reply to a hypothetical question which, contrary to defendants' contentions, was proper in every material respect, gave as his opinion that propane gas in plaintiff's basement caused the explosion. In that connection he said that the gas, being about 1½ times heavier than air, came out through the holes in the corroded copper tubing and slowly seeped down through the drainage in which it was covered or laid. Upon reaching the basement wall the gas seeped directly through the basement concrete blocks or imperfections in the mortar and accumulated in that part of the basement into which it came; and when, by spreading out, its lower limit of inflammability was reached, a flame of some sort ignited the mixture and the explosion resulted therefrom.

Prior experiments and tests made by the witness had demonstrated the fact that propane gas under slight pressure would seep through standard cement blocks. With permission of the court, such an experiment was appropriately performed by the witness in the presence

of the jury, whereat propane gas released by a valvular apparatus at low pressure, seeped through a standard cement block comparable in size with those in plaintiff's basement wall, and was ignited on the opposite side of it, where it burned for 10 or 15 seconds until the gas supply was shut off. We believe that plaintiff adduced competent evidence from which it could have been reasonably concluded that the leakage of gas came from no other facility or part of the system, and that because the piping was negligently supplied and installed by defendants, the gas did seep into plaintiff's basement in the manner claimed by him, which proximately caused the explosion and plaintiff's damages, which are not in dispute here.

Under the evidence aforesaid, we conclude that the question of liability of defendants and each of them was for the jury. Innumerable authorities sustain that conclusion.

In that connection, this court held in Fonda v. Northwestern Public Service Co., 138 Neb. 262, 292 N. W. 712: " 'A plaintiff is not bound to exclude the possibility that the accident might have happened in some other way, but is only required to satisfy the jury, by a fair preponderance of the evidence, that the injury occurred in the manner claimed.' Tonkovitch v. Indiana Mining Co., 153 N. W. 811 (187 Mich. 186)."

In Restatement, Torts, § 388, p. 1039, it is said: "One who supplies directly or through a third person a chattel for another to use, is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be in the vicinity of its probable use, for bodily harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier (a) knows, or from facts known to him should realize, that the chattel is or is likely to be dangerous for the use for which it is supplied; (b) and has no reason to believe that those for whose use the chattel is supplied will realize its

dangerous condition; and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be so." Also, in Restatement, Torts, § 399, p. 1085, it is said: "A vendor of a chattel, manufactured by a third person, who sells it knowing that it is, or is likely to be dangerous, is subject to liability as stated in §§ 388 to 390." As stated in Restatement, Torts, § 401, p. 1087: "A vendor of a chattel made by a third person which is bought as safe for use in reliance upon the vendor's profession of competence and care is subject to liability for bodily harm caused by the vendor's failure to exercise reasonable competence and care to supply the chattel in a condition safe for use."

In that connection, in Restatement, 1948 Supp., § 401, p. 710, it is said: "A vendor of a chattel manufactured by a third person who has reason to know that the chattel is, or is likely to be, dangerous when used by a person to whom it is delivered or for whose use it is supplied, or to others whom the vendor should expect to share in, or be in the vicinity of its use, is subject to liability for bodily harm caused thereby to them." See, also, Restatement, Torts, § 402, p. 1089, wherein it is said: "A vendor of a chattel manufactured by a third person is subject to liability as stated in § 399, if, although he is ignorant of the dangerous character or condition of the chattel, he could have discovered it by exercising reasonable care to utilize the peculiar opportunity and competence which as a dealer in such chattels he has or should have."

As stated in 46 Am. Jur., Sales, § 817, p. 943: "Moreover, where the seller of an article reasonably must know that if it is defective it will be imminently dangerous to persons likely to come in contact therewith, a duty rests upon him to use ordinary care to ascertain the condition of the article and see that it is safe, especially where, by representation or warranties that the article is safe, he induces the sale. If he fails to exercise ordi-

nary care to ascertain the safety of the article, so that he actually sells it in an imminently dangerous condition, he is liable for injuries to third persons who he knows will come in contact with the article." See, also, 46 Am. Jur., Sales, § 803, p. 928.

The annotation in 42 A. L. R. 1249 cites and discusses numerous authorities relating to such questions. See, also, 22 Am. Jur., Explosions and Explosives, § 73, p. 197; Annotation, 60 A. L. R. 371; Colbert v. Holland Furnace Co., 333 Ill. 78, 164 N. E. 162, 60 A. L. R. 353; Flies v. Fox Brothers Buick Co., 196 Wis. 196, 218 N. W. 855, 60 A. L. R. 357.

Such citations aforesaid relate primarily to the question of L. & B.'s liability to plaintiff, but some of them, it will be observed, have application also to the question of B. S. & B.'s liability.

In that connection, Restatement, Torts, § 394, p. 1073, says: "The manufacturer of a chattel, which he knows to be, or to be likely to be, dangerous for use, is subject to liability as stated in §§ 388 to 390."

In 46 Am. Jur., Sales, § 823, p. 945, it is said: "A manufacturer of an article likely to cause injury to property may be liable on the ground of fraud to persons with whom he has no contract relations, if he made misrepresentations likely to mislead, or employed artifice, or actively concealed defects, or used other means to throw the user of the article off his guard." See, also, Annotation, 17 A. L. R. 707, citing numerous authorities, where it is said: "Another well-recognized exception to the general rule that a manufacturer of a defective article is not liable for injury to the person or property of one with whom he is not in contractual relations is where there are fraudulent representations made by the manufacturer, upon which the ultimate consumer relies."

As stated in 22 Am. Jur., Explosions and Explosives, § 73, p. 197: "A manufacturer or seller of goods which are not explosives but which by reason of a defect in

their construction are subject to explosion may be liable for injuries either by reason of the dangerous instrumentality doctrine or by reason of representations or warranties or the doctrine of nonliability may be applied in case of sales of goods not dangerous in themselves or in their use. * * * A manufacturer of a defective article who makes misrepresentations as to his product, upon which misrepresentations the ultimate consumer relies, is liable to the consumer for injuries sustained by the explosion of the article."

In Baxter v. Ford Motor Co., 168 Wash. 456, 12 P. 2d 409, 88 A. L. R. 521, it is said: "The rule in such cases does not rest upon contractual obligations, but rather on the principle that the original act of delivering an article is wrong, when, because of the lack of those qualities which the manufacturer represented it as having, the absence of which could not be readily detected by the consumer, the article is not safe for the purposes for which the consumer would ordinarily use it. * * * It would be unjust to recognize a rule that would permit manufacturers of goods to create a demand for their products by representing that they possess qualities which they, in fact, do not possess; and then, because there is no privity of contract existing between the consumer and the manufacturer, deny the consumer the right to recover if damages result from the absence of those qualities, when such absence is not readily noticeable." See, also, Bock v. Truck & Tractor, Inc., 18 Wash. 2d 458, 139 P. 2d 706; Bahlman v. Hudson Motor Car Co., 290 Mich. 683, 288 N. W. 309, 7 NCCA (NS) 790; Lill v. Murphy Door Bed Co., 290 Ill. App. 328, 8 N. E. 2d 714; Annotations, 39 A. L. R. 999, 63 A. L. R. 349, 105 A. L. R. 1510, 140 A. L. R. 249, citing numerous authorities. The annotation to 164 A. L. R. 569, beginning at page 584, traces the basis and growth of the so-called "general rule" that a manufacturer or supplier to a seller for retail is not ordinarily liable for negligence to remote vendees or other persons with whom he has

no contractual relations, and states clearly the controlling rules with relation thereto. As stated at page 591: "Although most of the courts * * * have not gone so far in asserting the nonexistence of the so-called general rule, it may be pointed out that if a manufacturer is excused from liability to a remote vendee for asserted negligence in the manufacture of a particular product or article offered to the consuming public through retailers, he is excused, in so far as any generalization may be stated, (1) because the injury or damage was not caused by any negligence of the manufacturer as a proximate cause; (2) because if there was some injury or damage resulting from the manufactured article, such injury or damage could not reasonably have been foreseen or anticipated by a prudent manufacturer under the circumstances of the case, and the manufacturer did not know, or should not have known, that danger from defective manufacture would be probable." As stated at page 596: "Such rules of tort have been outlined by the American Law Institute in its Restatement of the Law of Torts."

For reasons heretofore stated, we conclude that the judgment of the trial court granting a new trial should be and hereby is affirmed.

AFFIRMED.