WILLIS BAER, APPELLEE, v. OTTO SCHAAP, DOING BUSINESS AS SPEEDWAY SCAFFOLD COMPANY, APPELLANT, IMPLEADED WITH PARSONS CONSTRUCTION CO., A CORPORATION, APPELLEE.

97 N. W. 2d 207

Filed June 5, 1959. No. 34497.

*Webb, Kelley, Green & Byam,* for appellant.

*Rice & Adams* and *Schrempp & Lathrop,* for appellee Baer.

*O'Dowd & Swift* and *Crossman, Barton & Quinlan,* for appellee Parsons Constr. Co.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action at law brought in the district court for Douglas County by Willis Baer, hereafter referred to as the plaintiff, against Otto Schaap, doing business as Speedway Scaffold Company, hereafter referred to as the defendant, and Parsons Construction Company, hereafter referred to as Parsons. The Parsons Construction Company made payments to the plaintiff under the provisions of the Nebraska Workmen's Compensation Act for injuries he sustained while in the course

of his employment and was made a defendant in this action as required by the provisions of that act. The purpose of this action was to recover damages from the defendant for injuries sustained by the plaintiff when he fell from a scaffold constructed by the defendant. The case was tried to a jury, resulting in a verdict for the plaintiff in the amount of $20,000. The defendant moved for dismissal of the plaintiff's petition and for a directed verdict at the close of the plaintiff's evidence and at the close of all of the evidence. These motions were overruled. The defendant filed a motion for judgment notwithstanding the verdict and for a new trial. Both of these motions were overruled, and the defendant perfected appeal to this court.

The plaintiff's petition alleged that he was a bricklayer; that on or about September 14, 1954, he was employed by Parsons as a construction foreman in charge of certain alterations to be made on a building located on the southeast corner of the intersection of Seventeenth and Farnam Streets in Omaha; that pursuant to a contract with Parsons, the defendant, through his agents, servants, and employees, had erected, set in place, and rented to Parsons certain scaffolding around the outside of the building so that the plaintiff and his crew, and all employees of Parsons, might have access to the upper portion of the building; that the scaffolding thus erected by the defendant was erected in such a careless and negligent manner that one of the planks thereon gave way and thereby dropped the plaintiff to the sidewalk below, a distance of approximately 40 feet; that as a direct and proximate result of such negligence and carelessness the plaintiff suffered severe injuries; and that the scaffolding erected as aforesaid was not erected in a safe, suitable, and proper manner as required by section 48-425, R. R. S. 1943.

The amended answer of the defendant denied that he was guilty of any negligence, and alleged that on or about August 23, 1954, pursuant to an order of and

rental agreement with Parsons, and subject to the usual rental conditions existing between the defendant and Parsons, this defendant caused a steel scaffold to be erected around the building specified, in accordance with the specifications of Parsons; that the scaffolding was erected in a safe, suitable, and proper manner; that after the scaffolding was completely erected it was inspected and accepted by Parsons; that Parsons assumed and thereafter maintained control, supervision, and maintenance of the scaffolding for the duration of the particular construction in which Parsons was engaged; that the plaintiff was the foreman of and in general supervision over the contruction job being done by Parsons from and after August 23, 1954, and up to and including September 14, 1954; that the scaffolding was in the possession and control of the plaintiff; and that if any dangerous or defective condition existed, the plaintiff knew, or should have known, of its existence and thereby assumed any risk incident to the use of the scaffold. The defendant further alleged that after the scaffolding was completely erected by him and inspected and accepted by Parsons, alterations were made to the scaffolding by employees of Parsons working under the supervision of the plaintiff.

The plaintiff's reply to the amended answer of the defendant denied each and every allegation contained therein.

The defendant assigns as error the following: The trial court erred in denying defendant's motions to dismiss the plaintiff's petition and in denying the defendant's motions for directed verdict, also defendant's motion for judgment notwithstanding the verdict; the verdict and judgment were not supported by the evidence; the trial court erred in giving instruction No. 8 on its own motion; the trial court denied the defendant his right to have the jury instructed upon his theory of the case by refusing defendant's requested instructions Nos. 4, 8, and 9; and the verdict and judgment

were excessive, not supported by the evidence, and, in part, based upon instruction No. 15 given by the trial court, which instruction was erroneous.

The record discloses that the plaintiff had been engaged in general construction work for 30 years; that he had been a journeyman bricklayer since 1948; that he was 46 years of age at the time of the accident; that he had been a foreman for about a year or a year and a half with supervisory duties; and that he was acting in such capacity at the time of the accident while working for Parsons on the Patterson Building at Seventeenth and Farnam Streets in Omaha. The scaffolding around the building was erected before August 23, 1954, and when Parsons took over the job on August 24 or 25, the scaffolding was complete and ready for the plaintiff to go to work. Parsons had contracted to perform a portion of a remodeling job on the Patterson Building. This work consisted of replacing the cornice at the top of the 3-story building. Parsons ordered the necessary scaffolding to be erected by the defendant. The order was written by the defendant on a standard rental form and mailed to Parsons, but it was not signed by Parsons or anyone in authority for the corporation. The defendant erected a steel scaffold for Parsons and floored it with wooden planks.

It might be said at this point that the plaintiff does not contend that there was any defect in the steel scaffolding or that any plank in the flooring broke. The case has to do with the wooden planks that were used for flooring on the scaffolding.

When the scaffolding was erected to the proper height, planks were laid on the top of the frame to provide the flooring. In order to bring the scaffolding closer to the building on the north side, side brackets were attached to all top frames except the first three, between the scaffold and the building and extending straight toward the building. These side brackets were triangular in shape and approximately 21½ inches in

length across the top. The flooring was five planks in width, and one plank on the side bracket. These planks were 10 or 12 inches in width, and laid on the scaffold frames. A 16-foot plank was laid across three forms, or two spaces which were 14 feet in length. Two spaces were skipped and another 16-foot plank was laid across the next two spaces. A 14-foot plank was laid across the space skipped and on top of the 16-foot planks at either end, and overlapped the 16-foot planks a foot at each end. Nails were then driven through the planks where they overlapped to keep them from slipping.

The general foreman on the job for Parsons was Henry Chris Sorenson who made an inspection of the scaffolding and found 5 to 10 percent of the planks were unnailed. He and an employee undertook to nail the unnailed planks. This witness testified that after the scaffold had been inspected and accepted, Parsons added one plank on the side brackets along the north side of the building to provide a rest for a protective plywood wall. One side of this protective wall rested upon and was nailed to the flooring on the side brackets of the scaffold and the other side laid against and was supported by the building. A piece of wood was nailed to each plank in the flooring of the scaffold and side brackets where the planks overlapped and cleats were nailed to the underside of the flooring. The flooring and the protective plywood were covered with tarpaulin. This work was done by employees of Parsons under the supervision of Sorenson. This installation and the subsequent removal of the canvas and plywood did not change the structure of the scaffolding. Sorenson also testified that he replaced a defective plank on the other side of the scaffold from where the plaintiff fell.

On September 14, 1954, the plaintiff and his crew of workmen had almost completed the work for which the scaffold was required. By 1 o'clock that afternoon they had removed all of the tarpaulin, the pro-

tective plywood wall, and a portion of the safety rail on the outer side of the scaffold. Sometime between 2 and 3 o'clock on September 14, 1954, the plaintiff was standing upon the scaffold on the north side of the building on the plank in the flooring next to the building. The plank upon which he was standing was not covered, but was open to view. The plaintiff was washing the brick wall of the building with water, using a stone and brush. Dale Gosch, one of the workmen, was standing on the roof right above the plaintiff handing him material. He was approximately 3 feet from the plaintiff, and looking right at him when he fell. A plank suddenly "upended," dropping the plaintiff to the sidewalk below. The plank did not break, and no part of the steel scaffold was broken prior to the accident. The plank was 14 feet in length, and there were no nails in it. The plaintiff struck a canopy at a level lower than the floor of the scaffold. The plank fell between the scaffold and the building, and struck the building. The end of the plank which raised nearly struck the witness Gosch. Gosch testified that the plank which fell was from the main floor of the scaffolding and was one of the planks between the uprights of the scaffold.

Charles Cato, a workman on the job, testified that he arrived at the point where the plaintiff fell about the time the rescue squad arrived. This witness went up onto the scaffold to retrieve the plank which was teetering on the scaffold. He inspected the plank and found that it had no nails or nail holes in it. He further testified that this plank would barely reach across 3 supports on the scaffold, and that when it was placed across three supports it had only to slip an inch or so either way to upend.

The witness Edward Connolly testified that he was a salesman for the defendant and had experience in the erection of tubular steel scaffolding; that he was familiar with the manner in which such scaffolding

should be erected; and that planking should be laid across the frames and nailed if work on the scaffold was to be done for any length of time as planks have a tendency to "work," and the nailing would keep the planks from sliding back and forth so one end could drop. This witness further testified that in the interest of good safety it would be advisable to wire the end planks and nail all the others; and that in this particular scaffolding the planks laid for flooring were 14 and 16 feet in length, except for a few planks used only at the northwest corner of the building.

There is evidence to the effect that Parsons had safety rules in effect governing the use of scaffolds. There is no evidence to disclose that safety books or rules were given to the plaintiff, nor were they directed to his attention. It appears there were some safety slogans attached to the tool boxes on the job. Also, some reference is made to the custom of bricklayer foremen making daily inspections of scaffolds. The plaintiff testified that this was in accordance with the by-laws of bricklayers. Just what is meant by this statement is not clear from the record. The plaintiff made no inspection of the scaffold flooring between August 24, 1954, and the date of his injury, September 14, 1954. At various times during the progress of this construction work, other employees of Parsons used this scaffolding. The plaintiff testified that in his trade, at times, he erected low scaffolds; that he inspected the scaffolds as he felt responsible for the men working under him; also that he felt he had a right to rely upon the scaffolding furnished by the defendant.

There are certain well-established rules of law applicable to this case.

In determining the question of whether or not a motion for a directed verdict or for judgment notwithstanding the verdict should be sustained the court is required to consider the evidence in the light most favorable to the plaintiff and to resolve every con-

troverted fact in his favor, and he should have the benefit of every inference that can reasonably be deduced therefrom. See Anderson v. Evans, 164 Neb. 599, 83 N. W. 2d 59.

. Negligence is the omission to do something which a reasonable and prudent man, guided by those considerations which ordinarily regulate the conduct of human affairs, would do, or doing something which a reasonable, prudent man would not do; want of that degree of care that an ordinarily prudent person would have exercised under the same circumstances. See Bohmont v. Moore, 138 Neb. 784, 295 N. W. 419, 133 A. L. R. 270.

"Where different minds may draw different inferences or conclusions from the facts proved, or if there is a conflict in the evidence, the matter at issue must be submitted to the jury to be determined; but, where the evidence is undisputed, and but one reasonable inference can be drawn from the facts, the question is one of law for the court. * * * It is not the province of this court in reviewing the record in an action at law to resolve conflicts in or weigh the evidence. * * * It is presumed in such an action that controverted facts were decided by the jury in favor of the successful party, and its finding based on conflicting evidence will not be disturbed unless clearly wrong." Snyder v. Farmers Irr. Dist., 157 Neb. 771, 61 N. W. 2d 557.

"If contributory negligence is relied upon by defendant as an affirmative defense, the burden is upon him to prove it by a preponderance of the evidence pertinent to that issue contained in the whole record, except insofar as the same may appear in evidence adduced for plaintiff." Meyer v. Platte Valley Constr. Co., 147 Neb. 860, 25 N. W. 2d 412. See, also, Roberts v. Carlson, 142 Neb. 851, 8 N. W. 2d 175.

The plaintiff's petition charged the defendant with having violated his common-law duty by not using due care

in the erection of the scaffold, that is, the defendant was charged with negligence in the erection of the scaffold. In this connection we deem the following to be applicable.

The case of Tegler v. Farmers Union Gas & Oil Co., 124 Neb. 336, 246 N. W. 721, was an action for damages for alleged negligence which caused the death of the plaintiff's 4-year-old daughter against the defendant, a dealer engaged in buying and selling gasoline, kerosene, and other oils. This court said: "This is a tort action. 'It is a general rule that no cause of action in tort can arise from the breach of a duty existing by virtue of contract, except as between the parties thereto. Privity of contract is essential to the right of action. 20 R. C. L. 49, sec. 44.' 42 A. L. R. 1249, stating the foregoing rule and the reasons therefor in the annotation, and suggesting a rule affording a basis for liability, not inconsistent with the present trend of the courts to liberalize rules of liability for negligent acts which result in injuries to third parties. Briefly sketched, that enlarged rule suggests a duty of inspection and the use of ordinary care to see that a manufactured article, which, if defective, is imminently dangerous to persons the manufacturer knows will come in contact therewith, is not put upon the market in that condition. There was not privity of contract or of dealing between the parties hereto, but plaintiff has brought himself by his pleadings under the liberalized rule above suggested that, if the kerosene was actually inherently or imminently dangerous by reason of its content, then defendant would be liable for negligence to the plaintiff, if such negligence was the proximate cause of the injury."

The latest case touching upon this subject is Driekosen v. Black, Sivalls & Bryson, Inc., 158 Neb. 531, 64 N. W. 2d 88. This case concerned a suit against a supplier and installer of a propane gas system installed in the plaintiff's home. An explosion occurred re-

lating to such installation, resulting in damages. The plaintiff sought to recover damages from the manufacturer or installer of the gas system. We can see no difference between a bailor furnishing scaffolding and a manufacturer or installer of propane gas equipment, both of which are imminently dangerous if manufactured, installed, or erected in an unsafe manner, and both would fall into the same class of dangerous instrumentalities. With this in mind, we conclude that certain language in the above-cited case would be applicable to the instant case.

In the above-cited case, the court said: "As stated in 46 Am. Jur., Sales, § 817, p. 943: 'Moreover, where the seller of an article reasonably must know that if it is defective it will be imminently dangerous to persons likely to come in contact therewith, a duty rests upon him to use ordinary care to ascertain the condition of the article and see that it is safe, especially where, by representation or warranties that the article is safe, he induces the sale. If he fails to exercise ordinary care to ascertain the safety of the article, so that he actually sells it in an imminently dangerous condition, he is liable for injuries to third persons who he knows will come in contact with the article.' See, also, 46 Am. Jur., Sales, § 803, p. 928." See, also, Annotation, 164 A. L. R. 569.

The relationship between a supplier engaged in the business of erecting scaffolds for rental, and a construction company which rented one of the scaffolds from him for use in its business, is one of bailment. In other words, the defendant in the instant case is the bailor and Parsons is the bailee. See 8 C. J. S., Bailments, § 1, p. 222.

The rule announced in 6 Am. Jur., Bailments, § 317, p. 416, reads as follows: "Although there is authority in support of the view that the bailor of such an instrumentality for gratuitous use is responsible only for injuries from defects of which he is aware, and can-

not be made liable for not communicating anything he did not in fact know, whether he ought to have known it or not, yet if the bailment is a lucrative one, the obligation by which his liability to third persons is tested may include a duty to exercise reasonable diligence or ordinary care to see that the instrumentality is in a reasonably safe condition to avoid injuries to such persons, and it has even been held that he is required, in the exercise of such diligence, to inspect the machine to the end that such danger may not arise, and to make such simple and available tests as to its condition as the intended use would suggest to sensible and right-minded persons. Of course, even under this view, the bailor is not to be held responsible as a guarantor of the absolute integrity of the machine he lets." See, also, Rumsey v. Schollman Bros. Co., 156 Neb. 251, 55 N. W. 2d 668.

Restatement, Torts, § 388, p. 1039, reads as follows: "The words 'those whom the supplier should expect to use the chattel' and the words 'a person for whose use it is supplied' include not only the person to whom the chattel is turned over by the supplier but also all those who are members of a class whom the supplier should expect to use it or occupy it or share in its use with the consent of such person, irrespective of whether the supplier has any particular person in mind." See, also, MacPherson v. Buick Motor Co., 217 N. Y. 382, 111 N. E. 1050, L. R. A. 1916F 696, Ann. Cas. 1916C 440.

Under the foregoing authorities we conclude that the bailor of a scaffold for hire would be liable to an employee of the bailee who could have been expected to use the scaffold, if he has failed to exercise reasonable care to make the scaffold safe for the use for which it was supplied.

In this connection, the court instructed the jury on the degrees of negligence applicable to this case.

The plaintiff's petition alleges that there is a statutory duty imposed upon the defendant by section 48-

425, R. R. S. 1943. This statute provides in part: "All scaffolds, * * * supports or other mechanical contrivances used in the erection, repairing, alteration, removal or painting of any house, building, * * * or other structure, shall be erected and constructed in a safe, suitable and proper manner."

For a comprehensive review of the history of the legislation relating to what is now section 48-425, R. R. S. 1943, we make reference to Johnson v. Weborg, 142 Neb. 516, 7 N. W. 2d 65. In that case the plaintiff sought to recover damages for personal injuries caused by a fall from the roof of a barn upon which he was working for the defendant. The holding in the case is to the effect that a scaffold must be safe, suitable, and proper for the purpose for which it is used, and the employer is liable if it does not meet this requirement. The court said: "In construing legislation of the class herein considered, this court has long followed the rule that a failure to perform a mandatory duty enjoined by statute is negligence per se, and if any person to whom the duty is owed, or for whose protection the statute is enacted, is injured in consequence of such violation a case is made. Tralle v. Hartman Furniture & Carpet Co., 116 Neb. 418, 217 N. W. 952, and cases there cited."

The case of Butera v. Mardis Co., 99 Neb. 815, 157 N. W. 1024, was decided in 1916, before the amendment to the statute in 1919. An injured workman sued his employer and the owner of the real estate. The question before the court was the sufficiency of the evidence and the constitutionality of the provision holding the owner of the real estate liable. Reference was made to sections 3602 and 3612, Rev. St. 1913. Section 3602, Rev. St. 1913, is similar to section 48-425, R. R. S. 1943. It was held that: "* * * the intention of the statute is that the employer is to be an 'insurer as to furnishing such a place as it requires.'" The court said: "The employee may confidently rely upon the performance of this duty by his employer, * * *." In Johnson v.

Weborg, *supra*, it was pointed out that statutes such as ours appeared to have originated in New York.

In Winterson v. Pantel Realty Co., 135 Neb. 472, 282 N. W. 393, this court said: " 'Statutes requiring protective devices * * * scaffolding statutes, * * * and other statutes of like nature, impose a mandatory and affirmative duty upon the owners of such property, * * * the courts generally hold that a failure to perform a mandatory duty so enjoined is negligence per se, and if any person to whom the duty is owed, or for whose protection the statute is enacted, is injured in consequence of such violation, a case is made.' "

What the defendant seeks to show in the instant case is that section 48-425, R. R. S. 1943, has no applicability for the reason that the burden of this statute is laid upon employers only.

Referring to section 48-425, R. R. S. 1943, it states in part: "*All scaffolds, * * * supports or other mechanical contrivances used in the erection, repairing, alteration, * * * of any house, building, * * * shall be erected and constructed in a safe, suitable and proper manner.*" (Emphasis supplied.)

In Johnson v. Weborg, *supra*, this court said, with reference to the reenactment of this act in 1919, quoting from Strahl v. Miller, 97 Neb. 820, 151 N. W. 952, Ann. Cas. 1917A 141: " 'The fact that the statute does not in terms impose civil liability is immaterial. It is not necessary to the maintenance of an action that the statute so expressly provide.' "

Referring to a few of the New York cases, in Duggan v. National Constructors & Engineers, Inc., 223 App. Div. 163, 228 N. Y. S. 126, the plaintiff, an employee of a subcontractor engaged on a building under construction in the erection of the iron work, was injured when a ladder collapsed and he fell. The subcontractor engaged in doing the concrete work, who made the ladder, was liable for the injuries suffered, since it appeared that the ladder was used not only by his employees but also by

employees generally, and especially by the employees engaged in the erection of the iron work. The court said: "* * * a person who constructs a scaffold or erects a ladder to be used in the performance of labor in the erection of a building has a duty incapable of delegation, not merely to his own employees, but to all others making use of the structure for that purpose, to make such instruments of performance safe. * * * We think, therefore, that the question as to whether or not the ladder was properly constructed or whether it provided a safe and suitable means for performance of the work should have been submitted to the jury, * * *."

In Quigley v. Thatcher, 207 N. Y. 66, 100 N. E. 596, the case involved an employee of a subcontractor who sued the general contractor for injuries received when he fell from a defective scaffold erected by the general contractor. The court said: "* * * section 18 of the Labor Law (Cons. Laws, ch. 31), which provides: 'A person employing or directing another * * * in the erection, repairing, altering or painting of a house, building * * * shall not furnish * * * scaffolding, hoists, stays, ladders or other mechanical contrivances which are unsafe, unsuitable or improper, and which are not so constructed, placed and operated as to give proper protection to the life and limb of a person so employed or engaged.' * * * this statute is one for the protection of workmen from injury and undoubtedly is to be construed as liberally as may be for the accomplishment of the purpose for which it was thus framed, and under such interpretation we think that a contractor may by course of events become liable to a sub-contractor and his employees for the safety of a scaffold although originally and expressly he assumed no such responsibility."

Section 48-425, R. R. S. 1943, is not limited in its scope to an employer or landowner, but may include a supplier or bailor, who erects and rents a scaffold to a bailee, and the employees of the bailee who are required, during the progress of their work, to use the scaffold.

In the light of the authorities above cited, a mandatory duty is imposed upon the bailor to furnish the proper materials and to see to it that the scaffold is constructed in such a manner as to give proper protection to the life and limb of a person employed to work upon and use the scaffold. If the bailor fails to comply with such duty and negligently erects a scaffold, and an employee of the bailee is injured while working upon the same in the course of his employment, the bailor would be liable within the contemplation of section 48-425, R. R. S. 1943.

The defendant predicates error upon the giving of instruction No. 8 which defendant claims is drawn from the language of section 48-425, R. R. S. 1943, and is based upon an application of that statute to the defendant. The defendant asserts that the statute does not impose a burden upon one situated as is the defendant for the benefit of one situated as is the plaintiff; that the statute does not apply to the defendant; and that the instruction is in error, which would call for a reversal of this case.

As we read instruction No. 8, the trial court made some reference to section 48-425, R. R. S. 1943. The court did instruct the jury on the common-law duty of due care and the essential elements relating thereto. The instruction did not impose a mandatory duty upon the defendant in any respect as provided by statute, but defined the common-law duty of a supplier or bailor. We fail to find any prejudicial error in the giving of instruction No. 8.

If an examination of all the instructions given by the trial court discloses that they fairly and correctly state the law applicable under the evidence, error cannot be predicated thereon. Blanchard v. Lawson, 148 Neb. 299, 27 N. W. 2d 217.

We conclude that the defendant's contention is without merit.

The defendant contends that the plaintiff's petition is insufficient to constitute a cause of action.

. This court in Behrens v. Gottula, 160 Neb. 103, 69 N. W. 2d 384, held: "Where a petition charges specific grounds of negligence as a basis for recovery, and also contains a general allegation of negligence on the part of the defendant in causing the damage, and where no motion for a more specific statement is filed, it is competent under the general allegation of negligence to offer evidence of any fact which contributed to the injury." See, also, Union P. Ry. Co. v. Vincent, 58 Neb. 171, 78 N. W. 457.

We conclude that the defendant's contention is without merit.

The defendant contends that the trial court denied him his right to have the jury instructed upon his theory of the case, which he contends was supported by evidence, when the court refused the defendant's tendered instructions Nos. 4, 8, and 9.

We have examined these instructions and find requested instruction No. 4 to be applicable to the instant case if the defendant has no statutory duty under section 48-425, R. R. S. 1943.

Tendered instructions Nos. 8 and 9, refused by the trial court, are alleged to be correct statements of the law based upon the decisions in Ring v. Duey, 162 Neb. 423, 76 N. W. 2d 433, and Wright v. Salvation Army, 125 Neb. 216, 249 N. W. 549. The defendant asserts that there was evidence that the plank which fell with the plaintiff was exposed to his full view, that is, the alleged defects, consisting as they do only in the placement of the plank and the absence of nails, could be seen.

The first above-cited case has no applicability to the instant case. It involves the proposition that when a person, being in a place of safety, sees or could have seen the approach of a moving vehicle in close proximity to him and suddenly moves from the place of safety into the path of such vehicle and is struck, his own conduct constitutes contributory negligence more than

slight in degree, as a matter of law, and precludes recovery.

The other case relied upon, Wright v. Salvation Army, *supra,* held: "One who walks into an open elevator shaft, on premises with which he is familiar, without looking to see whether the elevator had been moved, is guilty of gross contributory negligence and cannot recover for injuries thereby sustained."

In this connection, from the evidence there was nothing to indicate to the plaintiff that an inspection of each plank should be made by him. The defect which caused the accident was not an open and patent danger. In Johnson v. Weborg, *supra,* this court said: "* * * we hold that plaintiff had a right to rely upon the safe condition of the scaffold provided for him."

The defendant contends that the verdict and judgment are excessive, not supported by the evidence, contrary thereto, and, in part, based upon instruction No. 15 given by the trial court upon its own motion.

We have examined the evidence relating to the injuries sustained by the plaintiff as a result of his falling from the scaffold. The plaintiff suffered a compressed fracture of a vertebra, compressing it to approximately one-third its normal size, and had a permanent disability of his body as a whole of 10 to 15 percent. He was hospitalized for 17 days and returned to light work in the latter part of October 1954. The plaintiff suffered a heart attack which caused him to abandon his regular type of work, and he took work as a taxicab driver.

The defendant asserts that the trial court, in instruction No. 15, instructed the jury with reference to future loss of earnings as an element of damages, and that this instruction was misleading for the reason that it can be concluded that the verdict included an award for the future loss of earnings, which was contrary to the evidence.

With reference to instruction No. 15, the court told the jury: "* * * if the evidence shows with reasonable

certainty the extent of any depletion in his earning power for the future you will consider that too and allow for the same, * * *. No evidence has been offered that the heart attack suffered by plaintiff was proximately caused by or resulted from plaintiff's fall from the scaffold, and, therefore, plaintiff's heart condition and any disability resulting from it may not be considered by you in determining the measure of damages in this case."

In Arnold v. Lance, 166 Neb. 834, 90 N. W. 2d 814, this court held: "A verdict may be set aside as excessive only when it is so clearly exorbitant as to indicate that it was the result of passion, prejudice, mistake, or some means not apparent in the record, or that it is clear that the jury disregarded the evidence or controlling rules of law."

We conclude that there was no prejudicial error in instruction No. 15 given by the trial court, and see no reason to set aside the verdict as being excessive.

From the evidence heretofore set out, we conclude that a jury question was presented as to whether or not the defendant was negligent as contended for by the plaintiff.

We conclude that the judgment of the trial court should be, and is hereby, affirmed.

AFFIRMED.

CARTER, YEAGER, and BOSLAUGH, JJ., dissenting.

The Parsons Construction Company contracted to replace the cornice and supporting firewall on the north and west sides of the Patterson Building in Omaha. Parsons contracted with the defendant Schaap, doing business as the Speedway Scaffold Company, to furnish and erect a steel scaffold from which this work could be done. The scaffold was erected on or before August 23, 1954, and turned over to Parsons for use. On September 14, 1954, the plaintiff fell from the scaffold due to the upending of a plank upon which he was standing while at work. The question to be determined on this appeal

is whether or not the evidence is sufficient to support a judgment based on a finding that Speedway furnished and negligently installed the plank which upended and caused the accident.

The evidence is undisputed that Speedway properly constructed the steel or iron portions of the scaffold. The main platform of the scaffold was planked with five planks 10 and 12 inches in width. Between the main platform and the building brackets were attached having a width of 21½ inches on which one additional 10 or 12 inch plank was laid. All planks overlapped on the ends and were spiked together, although some issue was raised on this which we will hereafter discuss.

The evidence of the witness Connolly, who erected the scaffold for Speedway, is that he personally spiked every plank. The testimony of the witness Sorenson, the general superintendent for Parsons, is that he found about 5 percent of the planks not spiked and that he caused these to be spiked before employees of Parsons were permitted to use the scaffold. As an additional precaution he spiked some of the planks from the under side and added some cleats to insure safety in the use of the scaffold. Sorenson testified that the scaffold was erected in an excellent manner, although he took further steps to insure safety in its use.

The evidence further shows that Parsons caused long strips of ¾ inch plywood to be leaned against the wall of the building which were toe-nailed to the inside plank of the main platform put in by Speedway to prevent debris falling through to the sidewalk below. Parsons also set up plywood, four feet in height, around the outside of the scaffold platform to prevent workmen from falling from the scaffold, in addition to the guard posts and chains erected by Speedway. The platform and plywood were then covered with canvas. After this was done the employees of Parsons used the scaffold from August 23, 1954, to September 14, 1954, without mishap in rebuilding the cornice and firewall on the building.

During this period Speedway did not inspect nor was it required to inspect the scaffold.

On the morning of September 14, 1954, the employees of Parsons removed the canvas, the plywood guard around the platform, and the plywood over the space next to the building. In the afternoon the plaintiff was engaged in washing the lime and mortar stains off the newly constructed firewall. While standing on the plank nearest the building in the performance of this work, the plank upended and he fell through the space nearest the building to the sidewalk below and was injured. It is not disputed that the plank which upended had no nail holes in it and had not, therefore, been spiked. The question at issue, reduced to its simplest form, is whether there is any evidence that the plank was one furnished and negligently installed by Speedway sufficient to take that issue to the jury.

The plaintiff testified he was standing on the plank closest to the building and that he fell through the space nearest the building. After his fall he observed the space through which he fell and stated that it was the space next to the building. The witness Cato stated that the brackets were completely covered with planks which means that planks had been added after Speedway had turned the scaffold over to Parsons. The witness Gosch testified that it was the inside board of the main platform which upended. His statement is clearly explainable by his evidence that there were no brackets on the scaffold, a statement which is in conflict with the evidence of every other witness having any knowledge of the facts. His evidence is in direct conflict with that of plaintiff, Cato, Sorenson, and Connolly as to where the upended plank came from. His conclusion rested on a completely false premise, a situation which produced a false conclusion.

The witness Connolly states that he made a record of all materials used in the erection of the scaffold which he supervised. He dismantled the scaffold short-

ly after the accident and he testified that every plank he installed was in place and properly spiked. No witness testified that any plank installed by Speedway was missing from its proper place after the accident.

The witness Sorenson who was Parsons' general superintendent testified that he inspected the scaffold immediately after the accident. He found no plank installed by Speedway out of its proper place. He testified that Speedway covered the main platform its full width with five planks which were 10 and 12 inches in width and placed one plank on the brackets, all of which were properly in place after the accident. He testified also that he examined the plank which had upended, that it contained no nail holes, and that it was covered with paint and plaster lime. He recognized the plank which had upended as a used one that he had taken from Parsons' material yard for use in anchoring the Parsons' derrick on the roof of the Patterson Building. He was positive that the plank was not one installed by Speedway. Sorenson testified that Speedway placed but one plank on the brackets. At the time he supervised the installation of the plywood over the space next to the building, the number of planks on the brackets varied from one to two in through there. This clearly shows that some planks had been added after the scaffold had been turned over to Parsons.

We submit that there is not a scintilla of evidence that the plank which upended belonged to or was negligently installed by Speedway. We point out that after the scaffold was erected it was turned over to Parsons. Speedway is not shown to have been under any obligation to inspect or maintain the scaffold after it passed under the control of Parsons. Parsons inspected and took additional safety precautions before its employees were permitted to use it. For more than 3 weeks Parsons' employees had been using the scaffold in the performance of their work. Parsons not only had added plywood and canvas to the scaffold as before

stated, but it had dismantled its contributions to the safety of the scaffold. The scaffold had been inspected, changed with additions, and exclusively controlled by Parsons for more than 3 weeks before the accident. The maintenance of the scaffold was assumed by Parsons and in the absence of proof that the plank which upended was furnished and negligently installed by Speedway, negligence by Speedway cannot be presumed. In our opinion, the plaintiff has failed to sustain his allegations of negligence by Speedway, and that the verdict and judgment have no support in the evidence.

A jury will not be permitted to return a verdict when there is no evidence sufficient to support it. It has long been the rule in this state that when the verdict is clearly wrong because of a want of support in the evidence, the verdict and judgment thereon cannot stand. See Pueppka v. Iowa Mutual Ins. Co., 165 Neb. 781, 87 N. W. 2d 410, and cases therein cited. It seems clear to us that the motion of Speedway for a directed verdict made at the close of all the evidence should have been sustained. We think the judgment of the district court should be reversed.