LIBBEY-OWENS FORD GLASS COMPANY, A FOREIGN CORPO-
RATION, APPELLEE, V. L & M PAPER COMPANY, A CORPORA-
TION, ET AL., APPELLANTS.

O. J. MILLER, APPELLEE, V. L & M PAPER COMPANY, A
CORPORATION, ET AL., APPELLANTS.

HENNINGSEN FOODS, INC., A CORPORATION, APPELLEE, V.
L & M PAPER COMPANY, A CORPORATION, ET AL.,
APPELLANTS.

205 N. W. 2d 523

Filed March 23, 1973.   Nos. 38552, 38553, 38554.

John R. Douglas of Cassem, Tierney, Adams & Henatsch, Harry B. Otis of Gaines, Spittler & Otis, Gross, Welch, Vinardi, Kauffman, Schatz & Day, and Lee A. Larson, for appellants.

Robert W. Haney of Haney, Wintroub & Haney, for appellees.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

SPENCER, J.

This appeal involves three consolidated cases to recover for fire losses sustained at Miller's Industrial Center in Omaha, Nebraska. The alleged cause of the fire was a forklift truck manufactured by Yale & Towne, Inc., and sold by Phil D. Fitzwater and Gerald E. Gathmann, doing business as All Makes Forklift Service, to L & M Paper Company, a corporation, the user of the forklift at the time of the fire. Yale & Towne crosspetitioned against All Makes and L & M, and All Makes cross-petitioned against Yale & Towne and L & M. By stipulation of the defendants, the cross-claims were submitted to the court and not decided by the jury. The jury returned a verdict for all the plaintiffs against all the defendants, and the trial court denied all the cross-petitions. We affirm.

Miller's Industrial Center consisted of three adjoining buildings. The fire, which occurred on March 2, 1965, originated in building No. 2, which was leased to L &

M. The other two plaintiffs leased the adjoining buildings. All the buildings are owned by Miller. L & M processed used paper, primarily tabulation cards, which were chopped into small pieces and compressed into bales up to 1,000 pounds. The forklift was used to move the bales from the baling machine to a place of storage, and eventually to load them on railroad cars. L & M had been using a propane-operated forklift truck, also purchased from All Makes. This truck proved inadequate, and was returned. On the recommendation of Fitzwater of All Makes, L & M purchased the Yale & Towne electric forklift truck involved herein. It was received in late November or early December of 1964.

The order for the forklift, as printed, provided for: "dust covers on lift and drive motors." This was crossed out, and the notation made, "enclosed motors." The motors were enclosed. All Makes was well aware of the nature of the business where the truck was to be used, but did not communicate this information to Yale & Towne other than might be inferred from the statement, "enclosed motors."

The forklift was manufactured with a resistor coil located underneath the forklift, within a few inches of the floor, toward the front. It had a V-shaped trough approximately 8 inches in length, located underneath the coil, within 1 to 1½ inches from the coil itself. The purpose of the trough was to protect the coil from damage from being struck by some foreign object on the floor. There was no covering placed over the coil. It was unprotected and exposed from above.

One of Yale & Towne's design engineers testified the coil was designed to heat to 1,200 degrees Fahrenheit. The evidence is undisputed that this information was never communicated to All Makes, the local distributor, nor to L & M, the purchaser. This information was not to be found in any of the written material furnished to the parties, nor was there any warning of this propensity

on the forklift itself. Yale & Towne's design engineer testified the use of a forklift with an exposed coil was dangerous in an atmosphere containing combustible material. The room used by L & M was not provided with automatic sprinklers. They were not aware of the ordinance pertaining to sprinklers. Flammable material was stored in the basement. After paper had been baled, L & M personnel would stack the bales on the north and south of a center aisle awaiting shipment.

Plaintiffs' expert was asked if this type of truck was a proper and safe design for use in a warehouse, i.e., a paper baling warehouse. His response is as follows: "The design for the E type, in this Automatic truck permits dust to collect in a trough underneath the resistor coil, which in a sense is a heater coil during the operation of the unit and therefore is unsafe from a design standpoint, because it can collect an amount of dust in the shield that is protecting it mechanically, and it rests the dust against the resistor which is heated during the operation."

Plaintiffs' expert witness further testified that the paper that could collect in the collector underneath the coil would not necessarily have to be paper that fell on the coil and into the shield, but could be paper that had been brought up from the floor by reason of the draft reaction of the heat. The heat would have a stack effect and would pick up dust and small bits of paper, depending on the amount of the heat and the weight of the paper. If the resistor coil was covered, there would be no way for this accumulation to touch the coil itself.

During the 3 months the forklift was in the possession of L & M, their employees experienced difficulty with it. Various electrical points on the truck broke down or went bad, and the exposed resistor coil would heat up. The resistor coil would get hot enough for the coil to have a red glow. On occasion, it would even become cherry red. When the coil became cherry red, the em-

ployees were instructed not to operate the machine. On other occasions they were instructed to take the forklift over to the air compressor every 2 hours to blow the accumulation off the coil and to keep it and the rest of the machine clean.

All Makes was kept advised of the trouble, and on occasion the truck was taken back to the All Makes shop. The All Makes forklift serviceman thought the cherry red condition was caused by a malfunction of the machine. Neither he nor his employers knew that the machine was designed so that the coil would reach 1,200 degrees Fahrenheit. He believed something mechanical was causing the supposed malfunction and in each instance attempted to repair it. Whenever he returned the forklift to L & M he was under the impression that he had corrected the problem.

The forklift was accelerated by the operator turning the handle through three points. The first of the three points caused the machine to move at a low speed. Most of the electrical energy at this speed would be dissipated through the resistor coil in the form of heat. The handle turned to the second speed allowed additional acceleration, with only half the electrical energy passing through the resistor coil. Upon the handle being turned to the third point, all the electrical energy was applied to the motor and the resistor coil was entirely bypassed.

On the day of the fire, All Makes forklift serviceman was called to L & M's place of business because the truck was again heating up. He replaced the points which were broken. He also took a wire from third, or low speed, so that it would break down the heat resistance. The truck then operated in second and high. What he did had the effect of cutting the heat resistance.

Loose paper was on the floor when the machine was put back into operation. The serviceman told Trachtenbarg, one of the owners of L & M, to keep the machine clean by blowing it off to prevent a fire. It would keep

the paper from building up around the resistor coil. He also advised Trachtenbarg to sweep the aisles and the area where the truck would run.

The fire occurred about 7 p.m. Only one employee was on the premises. He was operating the forklift when a bale broke and scraps of confetti-like paper fell on the resistor coil, ignited, and set fire to the building. He was going to run the broken bale back through the chopper. The chopper has a hydraulic ram which compresses the chopped paper into a bale. He had taken one piece of the broken bale over to the chopper and was going back to get another piece when he noticed smoke coming from the front of the forklift.

The employee observed the smoke coming from between the forks, and got down on his hands and knees to see exactly where the smoke was coming from. He could see a coil of wire with paper around it that was smoking. He tried to put the fire out by smothering it with his hands, but was unsuccessful. The flame was only an inch or 2 high. He then got his old jacket, which was on top of the baler, and tried to smother the fire with the jacket, but was unsuccessful. He then took a fire extinguisher off a nearby post, turned it upside down, but nothing came out. He then read the directions and followed them, but again nothing came out. He shook the fire extinguisher and dropped it on the floor, but still nothing came out. Although the fire extinguisher was not as heavy as he thought it should be, he could hear liquid inside it. When the fire extinguisher would not work, he ran and called the fire department. He believes about 5 minutes transpired from the time he first saw the fire until he called the fire department. The testimony is undisputed there were seven fire extinguishers on the premises which had last been serviced approximately 8 months before the fire.

Yale & Towne's possible liability is premised on three theories of negligence: (1) Negligent construction; (2)

negligent design; and (3) failure to warn the distributor and consumer of the design propensity of the coil to heat to 1,200 degrees Fahrenheit.

We assume negligent construction to include a malfunction in a perfectly-designed product. On this assumption we conclude that no evidence was adduced to sustain this theory of negligence. Yale & Towne's design engineer testified the coil was designed to heat to 1,200 degrees Fahrenheit. If a malfunction was responsible for the fire, that fact is not apparent from the record.

We interpret negligent design as used herein to mean a forklift which is functioning properly but is dangerous due to a faulty design. Yale & Towne's design engineer admitted that the use of a forklift with an exposed coil was dangerous in an atmosphere containing combustible material. Plaintiffs' expert specifically testified that the unit was unsafe from a design standpoint for the use to which it was put.

The third theory of negligence is for failure to warn that the unit could be dangerous for its intended use. In this regard, Yale & Towne argues that the forklift was not defective when sold, but became so only because of its use in a place for which it was not intended. The difficulty with this argument is that the heating range of the resistor was known only to Yale & Towne. It was in no way made evident to the distributor or user, either by printed material or other warning. Unaware of the design propensity of the resistor coil to heat to 1,200 degrees Fahrenheit, All Makes recommended it for use in a paper shredding and baling plant.

Can Yale & Towne avoid liability when it is obvious that because of its failure to warn it was impossible for All Makes or L & M to properly evaluate the functioning of the forklift? The Yale & Towne forklift literature contained warnings in other respects where the danger was not quite so great. The jury could reasonably assume that Yale & Towne's design engineers

should have realized that if all motors were to be enclosed, the forklift was to be used in an area where the atmosphere would include dust and possibly flammable fibers. Without a warning of some nature, Yale & Towne should have known that the distributor and purchaser of its forklift would not realize its dangerous condition.

Yale & Towne further argues that the plaintiffs cannot recover from it because after the defect became obvious, L & M continued to use the product and this relieves the manufacturer from liability. It argues in substance that its negligence could not be the proximate cause of any injury sustained by the plaintiffs but at most any negligence with which it could be charged furnished only a condition by which the injury was made possible.

Yale & Towne relies on the line of cases such as Lock v. Packard Flying Service, Inc. (1970), 185 Neb. 71, 173 N. W. 2d 516, 41 A. L. R. 3d 1313, in which we said: "The causal connection is broken if between the defendant's negligent act and the plaintiff's injury there has intervened the negligence of a third person who had full control of the situation and whose negligence was such as the defendant was not bound to anticipate and could not be said to have contemplated, which later negligence resulted directly in the injury to the plaintiff."

The fallacy with Yale & Towne's contention is that it has not met the conditions of the cases on which it places its reliance. Because of Yale & Towne's failure to inform its distributor and purchaser, no one knew the heating of the resistor was a design characteristic and was to be expected. All persons associated with the distributor and the purchaser believed the resistor coil to be heating up because of a malfunction.

Fitzwater testified that he did not realize the forklift was not suitable for use in certain areas, such as L & M Paper Company. All Makes forklift serviceman

testified he had been servicing forklifts for approximately 1 to 1½ years prior to the fire, and he had never been advised that the coil would heat to 1,200 degrees. He felt when the coil got hot something was wrong. This was the first time he had run into a heating resistor so he checked the manual furnished by Yale & Towne for reference to a hot coil, but did not find anything to indicate or cover the problem.

In Driekosen v. Black, Sivalls & Bryson, Inc. (1954), 158 Neb. 531, 64 N. W. 2d 88, a case involving a propane gas system, we adopted the language of Restatement, Torts, § 388, p. 1039, as follows: " 'One who supplies directly or through a third person a chattel for another to use, is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be in the vicinity of its probable use, for bodily harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier (a) knows, or from facts known to him should realize, that the chattel is or is likely to be dangerous for the use for which it is supplied; (b) and has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be so.' "

The jury could have found that in the absence of instructions or warnings from Yale & Towne, both All Makes and L & M could reasonably assume the heating up of the resistor coil was a malfunction which was repairable. The distributor's serviceman testified that on the very morning of the fire he repaired the forklift and told L & M that it was working satisfactorily. The evidence presented, including the testimony of Yale & Towne's products reliability manager, leaves no doubt that the forklift in question was defective for its use at the L & M Paper Company. We find Yale & Towne had a duty to warn its distributors and users of the

heating propensity of the exposed resistor coil.

It is not every intervening act or occurrence which will break the necessary causal connection and insulate the manufacturer from liability from his original negligent act or omission. The rule is very clearly stated in Comstock v. General Motors Corp. (1959), 358 Mich. 163, 99 N. W. 2d 627, 78 A. L. R. 2d 449. Generally, the effect of an intervening negligent act is tested by determining whether it was such as might reasonably have been foreseen as a consequence of the claimed negligence of the original actor. We are dealing with such an act here. The law does not require precision in foreseeing the exact hazard or consequence which happens. It is sufficient if what occurs is one of the kind of consequences which might reasonably be foreseen. The question whether negligence is, in view of the intervening negligence of a third person, such a continuing and substantial factor in producing an accident as to be a proximate cause of the injury, is a question of fact, rather than a question of law.

The considerations to be determined in deciding whether an intervening force is a superseding cause are well stated in Restatement, Torts 2d, § 442, p. 467, as follows: "The following considerations are of importance in determining whether an intervening force is a superseding cause of harm to another:

"(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

"(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

"(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

"(d) the fact that the operation of the intervening

force is due to a third person's act or to his failure to act;

"(e)   the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

"(f)   the degree of culpability of a wrongful act of a third person which sets the intervening force in motion."

We said in Driekosen v. Black, Sivalls & Bryson, Inc. (1954), 158 Neb. 531, 64 N. W. 2d 88: "If the original negligence is of a character which, according to the usual experience of mankind, is liable to invite or induce the intervention of some subsequent cause, the intervening cause will not excuse it, and the subsequent mischief will be held to be a result of the original negligence."

In an action based on negligence, the question of whether or not there was an intervening cause which removed the negligence of the defendant as the proximate cause is usually one for a jury. Wax v. Co-Operative Refinery Assn. (1951), 154 Neb. 42, 46 N. W. 2d 769.

When separate and independent acts of negligence by different persons combine to produce a single injury, each participant is liable for the damage although one of them alone would not have caused the result. Umberger v. Sankey (1949), 151 Neb. 488, 38 N. W. 2d 21.

There is no evidence that All Makes actually was aware that the resistor coil was designed to heat to 1,200 degrees Fahrenheit. However, there is evidence from which the jury could conclude that All Makes should have realized the design propensity. All Makes had recommended the forklift for use by L & M, knowing the exact nature of their business. As a distributor All Makes would be presumed to know the characteristic of the equipment it sold. It was well aware that the

resistor coil was heating cherry red for a considerable period before the fire. It made no attempt to communicate with the factory to ascertain if this condition was actually a malfunction.

All Makes forklift serviceman made several attempts to correct the supposed malfunction. On each occasion he though he had done so. Yet, the fact that the condition continued to exist raises a serious question in view of the location where the equipment was operating. All Makes may not have realized the danger, but its frequent occurrence should have alerted All Makes to the danger. If All Makes had consulted with Yale & Towne about the difficulty it was encountering with the forklift, it undoubtedly would have learned the condition was a design propensity rather than a malfunction. We cannot say that the jury was wrong in finding All Makes to be negligent.

L & M had been experiencing difficulties with the lift. They were well aware of its heating propensity. They certainly should have appreciated the possibility of fire. It is true they expected All Makes to repair the malfunction. It is also true that they relied on the recommendation of All Makes that the lift was suitable for their work. However, the problems encountered were sufficient to put them on notice of the danger involved. The fact that they instructed their employees to blow the machine off with compressed air every 2 hours indicated they were aware of the danger. The nature of their business was such that fire would be a constant hazard.

Prior to starting business, L & M purchased six fire extinguishers and had a fire equipment company service and charge them on June 10, 1964. On July 24, 1964, one of them was recharged and another extinguisher was purchased. There is no testimony that the extinguishers were checked after July 24, 1964. It is evident when the fire broke out on the evening of March 2, 1965, 8 months later, that the fire extinguisher

used by the employee was inoperative. On the record, the evidence was sufficient to permit the jury to find negligence on the part of L & M which concurred with the negligence of All Makes and Yale & Towne to produce the fire which caused the plaintiffs' damage.

The cross-claims filed by Yale & Towne and All Makes were denied by the court. Each of the defendants seek to avoid liability by blaming the others for the plaintiffs' damage. The record shows negligence on the part of all three defendants sufficient to sustain the verdict of the jury. Where evidence is conflicting, or where reasonable minds may draw different inferences or conclusions from the evidence, it is within the province of the jury or the court, when the case is tried without a jury, to decide the issues of fact, and the Supreme Court may not set aside or direct a verdict in such situation. See Mustard v. St. Paul Fire & Marine Ins. Co. (1968), 183 Neb. 15, 157 N. W. 2d 865.

L & M asserts error in the jury instructions. If there was any error in instructions it was waived by the parties. The instructions were submitted to all counsel for comment and objection prior to submission to the jury. No objection is reflected in the record as to the alleged erroneous instructions. The failure to object to instructions after they have been submitted to counsel for review will preclude raising an objection on appeal. Beveridge v. State (1968), 183 Neb. 406, 160 N. W. 2d 229.

The defendants argue that Henningsen Foods is not the real party in interest because the eggs destroyed by the fire were pledged to certain banks. Defendants assert the warehouse receipts issued to the banks pursuant to said pledges gave the banks title to the eggs and the banks therefore were the real parties in interest.

Henningsen pledged its inventory of dried eggs as collateral to the banks. The banks in turn loaned Henningsen 80 percent of the value of the pledged goods. There was no agreement to sell the eggs to the banks.

Henningsen did not need to obtain the approval of the banks before selling the eggs. The arrangement was a credit arrangement only.

Section 88-142, R. R. S. 1943, which was effective until September 1, 1965, provided: "A person to whom a receipt has been transferred, but not negotiated, acquires thereby, as against the transferor, the title to the goods *subject to the terms of any agreement with. the transferor.*" (Italics supplied.) The question presented to the jury was: Did the loan agreement between Henningsen and the banks call for transfer of the title to the eggs to the banks? The jury found there was no intention to transfer ownership of the eggs, and we cannot say that it was wrong on the record. The identical question was presented in Mount Tivy Winery, Inc. v. Lewis (1943), 134 F. 2d 120. There the court held: "Under the phrase * * * 'subject to the terms of any agreement with the transferor,' title to the goods would not pass by the transfer of warehouse receipt if the parties expressly agreed that it would not. Here the parties in the collateral agreement, * * * made an agreement for security." See, also, King Cattle Co. v. Joseph (1924), 158 Minn. 481, 198 N. W. 798; Hodges v. Lake Summit Co. (1930), 155 S. C. 436, 152 S. E. 658. Henningsen Foods, being the owner of the eggs at the time of the fire, could maintain an action for damages against third persons for their injury or conversion.

The judgment is accordingly affirmed.

AFFIRMED.