Irwin HELLER, Plaintiff–Appellant, Cross–Appellee,

v.

CHAMPION INTERNATIONAL CORPORATION, Defendant–Appellee, Cross–Appellant.

Nos. 1315, 442, Dockets 89–7207, 89–7223.

United States Court of Appeals, Second Circuit.

Argued June 12, 1989.

Decided Dec. 6, 1989.

George Cohen, New Haven, Conn. (Garrison, Kahn, Silbert & Arterton, Joseph D. Garrison, of counsel), for plaintiff-appellant, cross-appellee.

David L. Belt, New Haven, Conn. (Jacobs, Grudberg, Belt & Dow, P.C., Ira B. Grudberg, Susan H. Bartholomew, Alice S. Miskimin, of counsel), for defendant-appellee, cross-appellant.

Before OAKES, Chief Judge, and VAN GRAAFEILAND and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Irwin Heller appeals from a judgment of the United States District Court for the District of Connecticut, Ellen Bree Burns, *Chief Judge,* granting judgment n.o.v. in favor of Champion International Corporation ("Champion"), Heller's former employer. Heller claimed that various personnel documents provided to him during the course of his employment, combined with oral assurances from company officials, created an implied contract of employment under Connecticut law, and that Champion breached that contract when it demoted and later fired him in the fall of 1982.

After the jury found for Heller, the district court set aside the verdict on Champion's motion for judgment n.o.v., reasoning that "even if the contracts which [Heller] alleges exist, [Champion] had sufficient cause under the terms of the contracts to terminate [Heller]'s employment." Because in reaching this conclusion the district court improperly re-decided questions of fact and credibility that had been properly submitted to the jury, we reverse and remand for further proceedings.

## BACKGROUND

Viewing the evidence in the light most favorable to Heller, as we must in reviewing a judgment n.o.v., the following facts were established at trial. Heller was initially hired by U.S. Plywood Company in 1957 as an employment supervisor. After leaving that firm in 1964 to pursue a career as an independent consultant, Heller returned to the company in 1971, by which time U.S. Plywood had become a division of Champion. Two years later Heller was promoted to the position of Director of Compensation for the entire corporation. But in 1975, after a new chief executive officer reorganized the management of Champion, Heller was replaced as Director of Compensation by John Parker, who became Heller's new supervisor.

Each year from 1976 to 1980 Parker rated Heller's performance as "good" or "very good" in written performance evaluations. According to the evaluation forms, this meant that Heller "[c]onsistently me[t] all major requirements and often excel[led] in the performance of responsibilities", and at least met "all major requirements". Although Champion discontinued its policy of providing written evaluations in 1980, Heller continued to receive regular "merit increases" in salary. Ironically, Heller's "merit increases" were roughly equal, in percentage terms, to the ones received by Parker during the same period.

In August 1982 Heller learned from an outgoing manager that Parker was considering some type of employment action against him. Fearing that Parker was about to demote him because of his age (he was 52 at the time) or for some other improper purpose, Heller decided to tapercord future meetings with Parker in order to obtain "an accurate accounting of what was going to happen". Before going through with his plan, Heller consulted an attorney who advised him that the taping was not illegal, a proposition that Champion has never disputed.

On September 2, 1982, Parker met with Heller and demoted him to a nonsupervisory position. Heller taped this meeting without Parker's knowledge. According to

Parker's contemporaneous notes, he demoted Heller for the following reasons:

—A managerial style that resulted in a totally demoralized department—this determined by individual interviews with members of the department (his subordinates).

—Lackadaisical and lazy attitude.

—Unwilling to do anything by himself.

—Lack of direction and follow through to subordinates and in work assignments.

—Has not gotten off his butt and shown what he can do.

—Spends too much time in social conversation.

After his demotion, Heller confided to two coworkers that he had recorded the meeting with Parker and had consulted "a big-time lawyer who could make a big-time case" against the company. One of these confidants, Mark Davenport, approached Parker on September 30, 1982, and revealed to him that Heller had been "taping conversations of you in an effort to develop information that might be damaging to the corporation". Parker discussed this situation with Donald Gardner, the Vice President of Employee Relations, and Bill Foster, a company attorney, and on October 1, 1982, it was decided that Heller would be fired immediately. According to a plan devised by Parker and Foster, the dismissal would be carried out by initially telling Heller he was being fired "for performance reasons". However, if Heller admitted to tape-recording earlier meetings, the reason for the dismissal would be changed to "for cause".

Parker and Foster fired Heller that afternoon in a meeting that was also taped by Heller. As prearranged, Parker first told Heller he was being discharged for performance reasons, including "the lackadaisical and lazy attitude that you had * * * the negative attitude that you had * * * the inability to produce a general quality of work which was acceptable overall." Heller then indicated that he would notify his attorney, and said that "every conversation we've had is on a tape recorder and there are an awful lot of lies."

Having secured this admission, Parker and Foster fired Heller "for cause".

Heller commenced this lawsuit in December 1983, alleging that Champion's conduct violated the federal age discrimination statute and constituted a breach of contract under Connecticut law. With respect to his contract claim, Heller asserted that various handbooks, bulletins, and other personnel documents, as well as oral representations by company officials, created implied contractual obligations that prohibited Champion from demoting and later discharging him in the manner that it did. The jury found that Champion did not discriminate against Heller because of his age, but that it did breach the implied employment contract.

On Champion's motion for judgment n.o.v., the district court set aside the jury's finding on the contract claim, ruling that Champion "had sufficient cause under the terms of the [implied contract] to terminate the plaintiff's employment." Specifically, the court held that "Heller's deceptive, thoroughly unprofessional conduct" in taping meetings with his superiors and revealing that fact to coworkers "violated the standards of conduct which Champion imposed on its employees. Reasonable minds could only conclude that, under the terms of the very same policies [Heller] relies on to prove his contract theories, Champion had the right to discharge him for such conduct." Heller appeals that ruling.

## DISCUSSION

Judgment n.o.v. may be entered "only if, 'without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" *Stubbs v. Dudley*, 849 F.2d 83, 85 (2d Cir.1988) (quoting *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970)), *cert. denied*, —— U.S. ——, 109 S.Ct. 1095, 103 L.Ed.2d 230 (1989). For judgment n.o.v. to be proper, "either there must be 'such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture' or the evi-

dence must be so overwhelming that reasonable and fair-minded persons could only have reached the opposite result." *Baskin v. Hawley,* 807 F.2d 1120, 1129 (2d Cir. 1986) (quoting *Newmont Mines, Ltd. v. Hanover Ins. Co.,* 784 F.2d 127, 132 (2d Cir.1986)). Under these standards, the entry of judgment n.o.v. in this case was improper.

■ The district court set aside the jury's verdict for Heller because it found that "even if the contracts which [Heller] alleges exist, [Champion] had sufficient cause *under the terms of the contracts* to terminate the plaintiff's employment." Connecticut law, however, requires the trier of fact, here the jury, to determine the precise terms of an implied contract and whether any of those terms were breached. *See Carbone v. Atlantic Richfield Co.,* 204 Conn. 460, 471–72, 528 A.2d 1137, 1142 (1987) (whether employment manual gives rise to implied contract "is a question of fact to be determined by the trier of fact"); *Finley v. Aetna Life & Casualty Co.,* 202 Conn. 190, 199, 520 A.2d 208, 213–14 (1987) (whether personnel manual creates contractual obligations is "a question of fact properly to be determined by the jury"). Correctly applying these principles in the first instance, the district court had submitted to the jury the issues of the existence of an implied contract, its exact terms, and whether it was breached:

> * * * [T]he plaintiff must prove that the defendant's conduct in demoting the plaintiff and then terminating the plaintiff was contrary to the defendant's own writings that it would deal with its employees in good faith and fairly, or that it was contrary to their policies or practices.
>
> * * * * * *
>
> * * * You must determine, based on the totality of the employment relationship, whether Champion's demotion and termination of Mr. Heller complied with and lived up to the reasonable expectations of the parties.
>
> * * * * * *
>
> Plaintiff prevails with respect to his contract claim then if he proves an im-

plied contract which entitled him to continued employment so long as he performed his job satisfactorily and that the defendant breached such contract by demoting him and/or terminating him, and that those actions were contrary to policies and procedures.

> * * * * * *
>
> You also are to determine whether there was an implied contract between the defendant and the plaintiff by which the defendant agreed not to demote or terminate the plaintiff except in accordance with its policies, practices and procedures. * * * *Whether there was such an implied contract and, if so, what were its terms and whether it was violated, are questions of fact which you must determine* * * *. [emphasis added]

Since the district court had permitted the jury to determine these questions, one might have thought the jury's findings would have been the end of the case. Stating on the judgment n.o.v. motion, however, that it was "construing the contractual language of the parties, which is question of law, * * * *See Thompson & Peck, Inc. v. Harbor Marine Contracting Co.,* 203 Conn. 123, 131, [523 A.2d 1266, 1270] (1987)", the court concluded that Heller's "deceptive, thoroughly unprofessional conduct" gave Champion the right to discharge him under the terms of the contract.

■ The reasoning of the district court is flawed in two respects. First, as *Thompson & Peck* makes clear, the intent of the parties becomes a question of law only "[w]here there is definitive contract language". *Id.* But in cases involving implied employment contracts, the terms of which must be gleaned from employment manuals, company memoranda, and the "totality of the employment relationship", such definitive contract language is obviously lacking, and the intent of the parties remains a question of fact to be determined by the jury.

■ Second, in finding that Heller's conduct was "disruptive", "disorderly", "deceptive", and "thoroughly unprofessional", the district court necessarily involved itself in the resolution of credibility issues such as how much taping occurred, what Heller said about it, whom he spoke to, and whether his conduct and statements were actually disruptive to the company, not to mention whether Champion was acting in good faith when it purported to rely on the taping as the reason for terminating Heller. For example, the district court credited much of the testimony of Mark Davenport, Heller's unfaithful confidant, who testified that Heller had "consistently and very strongly" bad-mouthed Parker in front of other Champion employees. But the jury was entitled to disregard Davenport's testimony and believe other witnesses, including Heller, who testified to the contrary. Credibility issues of that nature are for the jury not the court to resolve.

■ As an alternative ground for affirmance, Champion argues that Heller's disloyalty gave it sufficient cause to discharge him as a matter of law, regardless of any contractual obligations the company may have owed to Heller. This argument is not properly before us, however, since Champion failed to raise it in its motion for directed verdict. Because a motion for judgment n.o.v. is technically only a renewal of the motion for directed verdict, it cannot assert a new ground for relief. *Meriwether v. Coughlin*, 879 F.2d 1037, 1044 (2d Cir.1989); *Hilord Chem. Corp. v. Ricoh Elecs., Inc.*, 875 F.2d 32, 37–38 (2d Cir.1989); *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir.1988); 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 2537 (1971). If Champion hoped to prevail on this alternative theory, it should have made certain to assert it at the close of the evidence. Having failed to do so, Champion was precluded from raising the point for the first time in its motion for judgment n.o.v., and it certainly cannot advance the argument here.

■ Even in the absence of a procedural bar, we would not agree that Heller's conduct justified his dismissal as a matter of law. Notwithstanding the credibility issues inherent in deciding what Heller's conduct actually involved and in the absence of clear indications in Connecticut law, we do not accept the proposition that an employee would never be justified in tape-recording conversations with his superiors and discussing a possible lawsuit, indeed a "big-time case", with two of his colleagues.

At the time the events of this lawsuit were unfolding, Heller believed that Champion was not only in the process of breaking its promises to him, but that it was also discriminating against him because of his age. His surreptitious tape-recording, to be sure, represents a kind of "disloyalty" to the company, but not necessarily the kind of disloyalty that under these circumstances would warrant dismissal as a matter of law. The Age Discrimination in Employment Act prohibits employers from discharging individuals because they have "participated *in any manner* in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d) (emphasis added). Under this provision, we have held that it was protected activity to draft a memo containing evidence of age discrimination, ask the company's president to approve the memo without revealing its true purpose, and then use the signed memo in a subsequent lawsuit against the company. *See Grant v. Hazelett Strip–Casting Corp.*, 880 F.2d 1564, 1569–70 (2d Cir.1989). Other courts have found similarly "disloyal" acts to be protected under Title VII. *See EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1012–14 (9th Cir.1983) (writing letter to customer of employer complaining about inadequacies in employer's affirmative action program); *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1136–37 (5th Cir. Unit A 1981) (boycotting and picketing of store), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982); *Coleman v. Wayne State Univ.*, 664 F.Supp. 1082, 1092 & n. 5 (E.D.Mich.1987) (stating repeatedly in public and private that employer was engaging in discriminatory employment practices); *EEOC v. Kallir, Philips, Ross, Inc.*, 401 F.Supp. 66 (S.D.N.Y.1975) (discreetly ob-

taining written job description for use in investigation by New York City Commission on Human Rights), *aff'd mem.*, 559 F.2d 1203 (2d Cir.), *cert. denied*, 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). Considering the range of factors that might have justified Heller's conduct, especially his belief that he was gathering evidence in support of a possible claim of age discrimination, we cannot say that Champion had sufficient cause, as a matter of law, to dismiss him.

In granting judgment n.o.v., the district court failed to rule on Champion's alternative motion for a new trial, dismissing it "as moot." Although we have the power in such cases to order entry of judgment on the verdict, *see, e.g., Grant,* 880 F.2d at 1571, here the parties have agreed that the district court should have an opportunity in the first instance to decide the motion for a new trial. Accordingly, we remand the case to the district court for consideration of that motion.

### CONCLUSION

The judgment of the district court granting judgment n.o.v. in favor of Champion is reversed, and the case is remanded for further proceedings consistent with this opinion.

VAN GRAAFEILAND, Circuit Judge, dissenting:

Because, unlike my colleagues, I believe that a determination as to the propriety of Irwin Heller's discharge on October 1, 1982 should be based on what he did and said prior to his discharge rather than on his carefully rehearsed testimony given almost five years later, and because my concept of what constitutes employee loyalty differs markedly from that of my colleagues, I dissent.

Prior to the 1982 meeting, Heller's supervisors had been informed that Heller was secretly recording conversations with his superior officers. When confronted with this accusation, Heller disclosed that he had a recorder on his person at that very time. He told his superiors however, "OK, the tape recorder is not on." He lied. Un-

beknownst to his superiors, Heller was taping the entire meeting. As a result, there can be absolutely no question as to what each person said at that meeting. The following are illustrative excerpts:

HELLER: Yes, I understand that. I'm not going to discuss it in great, great detail, but very briefly, and this is not to be boastful but I have three different law firms that are anxious for me to sue because of the very hard, hard evidence ... documentation, but I have been reluctant to do that. But I am willing to divulge some of it in Harry Dodds ... in front of Harry Dodds with Andy Sigler ... and ... as evidence of the fact that ... I'm reluctant to do that, that was not my style. And I didn't want to be dragged down to this level, but, my hand is being forced. And I think ... you know, it's regrettable but I think before this is over—and I said this to you the last time—I think the company is making a big mistake. Be that as it may, I mean, I have seen this coming for a long time. I can only tell you that ...

FOSTER: How long? How long have you seen it coming?

HELLER: At least three ...

FOSTER: Three or four years?

HELLER: I want to tell you that every conversation we've had is on a tape recorder and there are an awful lot of lies.

\* \* \* \* \* \*

HELLER: OK, OK. You know, I still am saying to you now, and I'm not going to plead for my job at all because I think the conditions are intolerable at this stage of the game, but ... I didn't intend to come in to warn you ... but I advise you ... I advise this company that I'm not talking about an EEO case, I'm talking about something that's going to be a bloody mess. I'm a far bigger fighter than you people imagine. And I think you're more vulnerable than you imagine. And I think I would like Andy Sigler to know it without [inaudible].

FOSTER: Just a couple of ... tape recorders are not illegal.

HELLER: That's the least of my evidence.

FOSTER: I am not finished ... when you're dealing in a business relationship with a superior and a subordinate and conversations and their business content necessarily have to be confidential. There is no excuse for tape recording conversations. That is grounds for dismissal for cause.

HELLER: That's very true. That's true.

\* \* \* \* \* \*

HELLER: Because of what had been transpiring for years, I've got documentation. I've written all the things that have transpired.

\* \* \* \* \* \*

HELLER: I've tape recorded my conversation with John for years.

GARDNER: Why?

HELLER: Because the man has lied to me and I have got the documentation to prove it. He's lied to me constantly. And if you say that that's going to be the reason ...

GARDNER: [inaudible] you taped?

HELLER: Absolutely.

GARDNER: [inaudible] you taped?

HELLER: Absolutely.

GARDNER: On your person somewhere?

HELLER: Absolutely.

GARDNER: Oh, Jesus Christ, Irwin.

\* \* \* \* \* \*

FOSTER: You wanted to come over here and talk with Don Gardner to divulge ...

HELLER: No, I didn't, I didn't ... no, that's not true either. You didn't hear me carefully. I said that I am ready to divulge very hard documentation to Harry [inaudible] that makes attorneys that I have spoken to anxious to want to take on the corporation and which I have refrained from getting involved in. I could have started a law suit.

GARDNER: [inaudible]

HELLER: It's not my style.

FOSTER: Even though you have compiled all this information?

HELLER: Well, I took the tapes ...

FOSTER: ... in the last four or five years.

HELLER: That's right.

\* \* \* \* \* \*

FOSTER: You don't even care about the company. You've been disloyal to us.

HELLER: Disloyal? What? ...

FOSTER: For this thing you're holding in your hands. You've been doing it for five years [inaudible] your supervisors.

HELLER: I've been defending, I've been defending ...

Heller's superiors learned in 1982 that he was a paranoid conniver and sneak. They learned after this lawsuit was begun that he also was a liar. My colleagues say that, despite all the foregoing undisputed and undisputable words from Heller himself, the defendant was required to keep him in its employ. I disagree. I would not have a man such as this working for me. Moreover, I am satisfied that, if either of my colleagues discovered that one of his clerks had been secretly recording the judge's statements to him, that clerk's employment tenure would be as short as was Heller's. Almost two thousand years ago, Seneca, the Roman philosopher, wrote "Loyalty is the holiest good in the human heart."[1] If there is exaggeration in this statement, it is minimal. Loyalty is what one looks for in a spouse, what a country expects of its citizens, and what an employer is entitled to receive from his employees. "There is no more elemental cause for discharge of an employee than disloyalty to his employer." *NLRB v. Local Union No. 1229, International Brotherhood of Electric Workers*, 346 U.S. 464, 472, 74 S.Ct. 172, 176, 98 L.Ed. 195 (1953).

Loyalty to his employer is what caused Mark Davenport to go to both his minister and his lawyer seeking advice about whether to disclose to the employer that Heller was secretly recording conversations. Unlike my colleagues, I would not term an employee who does this "unfaithful."

---

**1.** "Fides sanctissimum humani pectoris bonum est." Seneca, Ad Lucillium, Epis. 88, 29 quoted in *The MacMillan Book of Proverbs, Maxims and Famous Phrases* 746 (1948).

Here was a man who was sorely troubled by the knowledge that his friend was doing something that he believed, and I believe, clearly was wrong. He sought advice from the best sources he knew, his minister and his lawyer. I regret that my colleagues see fit to pat Heller on the back for his contemptible conduct while they castigate Mark Davenport for doing what his conscience and his advisers told him was the proper thing to do.

I regret also that, as a result of our ruling in this case, every disgruntled employee in the Second Circuit henceforth will feel free to report to work with a tape recorder hidden on his person.