Christine HOLMES, Plaintiff and Appellee,

v.

WEGMAN OIL COMPANY, Defendant and Appellee,

and

White–Rodgers Division of Emerson Electric Company, and A.O. Smith Corporation, Defendants and Appellants.

George P. HOLMES, as Special Administrator of the Estate of Laura Holmes, Deceased, and George P. Holmes, as Guardian ad Litem of William Holmes and George Holmes, Minors, Plaintiff and Appellee,

v.

WEGMAN OIL COMPANY, Defendant and Appellee,

and

White–Rodgers Division of Emerson Electric Company, and A.O. Smith Corporation, Defendants and Appellants.

Merrell NESS, Plaintiff and Appellee,

v.

WEGMAN OIL COMPANY, Defendant and Appellee,

and

White–Rodgers Division of Emerson Electric Company, and A.O. Smith Corporation, Defendants and Appellants.

Nos. 15591, 15592, 15593, 15607, 15608 and 15609.

Supreme Court of South Dakota.

Argued April 20, 1992.

Decided Nov. 4, 1992.

Timothy M. Gebhart and Edwin E. Evans of Davenport, Evans, Hurwitz & Smith, Sioux Falls, Allen J. Eide and Thomas F. Burns of Gribbin, Burns & Eide, Watertown, for appellees Christine Holmes, George P. Holmes, and Merrell Ness.

John E. Simko of Woods, Fuller, Shultz & Smith Sioux Falls, for appellee Wegman Oil.

James C. Roby of Green, Schulz, Roby & Oviatt, Watertown, Ludwig E. Kolman and William M. Cohn of Pope & John, Ltd., Chicago, Ill., for appellants.

SABERS, Justice.

Plaintiffs recovered substantial damages for serious injuries received in an LP gas water heater explosion. Defendants appeal. We affirm.

## FACTS

White–Rodgers, a division of Emerson Electric Company, Inc. (White–Rodgers), was the manufacturer of the Starstat 3700 series liquified propane (LP) gas water heater thermostatic control (control). The development of the control began in 1962. Following testing, it was placed on the market in 1964. The controls were sold to various water heater manufacturers including A.O. Smith (Smith), Sears, State Industries, Rheem and W.L. Jackson. By the end of 1969, White–Rodgers had sold three million controls without incident.

These controls were intended to operate in the following manner. First, the control knob is turned from OFF to PILOT.

Second, the knob must be manually pushed down to allow gas to flow to the pilot light. Once the pilot light is lit, the knob must continue to be depressed until the thermocouple is warmed sufficiently. The thermocouple is a thermoelectric safety switch that allows gas to flow to the pilot light and to the main burner only when it is warmed by the pilot light. Thus, the thermocouple is designed to prevent unburned gas from escaping—unless it is bypassed by a depression of the control knob.

Third, when the thermocouple is warmed, the knob is allowed to spring back to its former position, turned to ON and then the water begins to heat.

If the pilot light goes out and the knob is stuck down or depressed in the PILOT position, unburned gas will escape from the pilot light into the air. If the pilot light goes out and the knob is stuck down or depressed in the ON position, unburned gas will escape from the pilot and the main burner. LP gas is normally odorized to alert users to the presence of any unburned gas in the air.

The knob on the control was made of a relatively soft plastic material known as Styron 475. These knobs had a spline, or ridge, smaller than the head of a paper match, also made of this soft plastic. The spline was intended to prevent the knob from being depressed in the ON position or being turned to ON while depressed.

In 1969, Smith informed White–Rodgers that the knob on the control could stick down in the PILOT position due to plastic shavings from the knob which prevented the knob from springing back. These shavings resulted from depressing the knob while slightly misaligned. In July 1970, White–Rodgers also learned that tests in Japan revealed the plastic spline could be shaved after turning the knob as few as ten times. After White–Rodgers received this information, it began testing harder plastics to remedy this problem. In late 1970, White–Rodgers introduced a new Tuf–Flex knob, but did not attempt to remedy the knob problem on controls sold prior to 1970 at that time.

In 1971, 1973 and 1974 White–Rodgers was informed of lawsuits arising from explosions caused by these knobs. The plastic knobs had been damaged and then turned from PILOT to ON while partially depressed thereby overriding the safety mechanism. White–Rodgers instructed its personnel, during this time period, to approach damage claims stemming from its controls with "the foregone conclusion that we are not involved."

In response to these lawsuits and explosions, White–Rodgers began testing a new

knob for the control. A new control, which included an improved knob, went into production in 1976. In late 1976, White–Rodgers again improved the control by using a stronger material for the knob and spline and by making the spline four times larger. After making these changes, White–Rodgers destroyed its inventory of old knobs. Despite these design changes to prevent the known dangers of the prior knobs, no effort was made to remedy knob problems on controls sold prior to 1976.

From 1976 to 1979, eleven more accidents were reported to White–Rodgers which resulted from the control knob. This brought the total number of explosions to twenty-two since the control was first introduced and included five deaths and nineteen injuries. White–Rodgers had previously implemented a recall program on another product after receiving only *one* reported incident. In 1980, White–Rodgers began production of a redesigned control with a reinforcing collar around the knob and a warning not to use tools on the knob. All of these changes, including the thicker spline and stronger materials, were feasible in the mid–1960's at a cost of five to ten cents per control.

In late 1980, White–Rodgers began a recall campaign.[1] The recall included all controls produced between 1961 and 1980. The recall was approved by the Consumer Product Safety Commission (CPSC) and consisted of mailing notices to all LP dealers. One of these dealers was Wegman Oil Company (Wegman) in Raymond, South Dakota. These notices informed the dealers of the knob problems and requested that they send White–Rodgers their customer lists. White–Rodgers intended to use these customer lists to send recall notices directly to the consumers. However, many LP dealers did not respond due to concerns over the loss of customer name confidentiality, potential dealer liability, and/or unreimbursed expenses. White–

Rodgers began to contact these unresponsive dealers alphabetically by phone in April and May of 1981, but stopped after reaching the letter "C". No other attempt was made to contact unresponsive dealers, including Wegman, for their customer lists until after this explosion.

Despite his failure to comply with White–Rodgers' request for his customer list, Wegman did participate in the recall program. Shortly after the notices were sent to the LP dealers in December 1980, one of Wegman's customers read about the recall in the newspaper and contacted White–Rodgers. White–Rodgers in turn contacted Wegman and sent him a free control to replace the customer's recalled control. From January 1981 to June 26, 1983, Wegman changed 16 recalled controls, including his own and that of his son.

In May 1983, Christine Holmes (Holmes) and her children moved into a house she bought in Henry, S.D. The water heater and other appliances were fueled by LP gas. Holmes called Wegman to fill the tanks and to hook up the gas. On May 31, 1983, while at the Holmes' residence, Wegman noticed the control on the water heater was corroded due to water drippage. He told Holmes it needed replacement and suggested a used or salvaged control he had on his truck. Holmes agreed.

The salvaged control was a White–Rodgers control manufactured in 1967 and subject to the recall. Wegman testified he had placed the control in his truck, after removing it from another water heater prior to the 1980 recall. Wegman testified that, after inspecting the control for damage, he installed it on Holmes' water heater and then checked to make sure it was working properly. He then instructed Holmes' boyfriend, Allen Ness, in the proper manner of lighting the pilot light.

Over the next three weeks, the pilot light on Holmes' water heater went out several

1. White–Rodgers attempted recalls in 1979 utilizing a test recall program limited to the state of Illinois and a subsequent national mailing to LP dealers. Although this mailing informed dealers of the knob problems, it stated:

It is important to note that this problem is strictly related to damage through abuse. It is NOT a design, manufacturing, or wear problem related to the thermostat or the pilot gas cock knob.
This mailing was not sent to Wegman Oil Co.

times. Each time Allen Ness relit it. On June 26, 1983, Holmes started to the basement to re-light the pilot when Allen's brother, Merrell Ness (Ness), arrived. She asked him to light the pilot. Ness and Holmes went to light the pilot and Holmes' children followed. As soon as Ness lit the match, an explosion occurred.

As a result of the explosion, Holmes was burned over 70 percent of her body and underwent five operations; Ness had second and third-degree burns over 62 percent of his body and underwent two skin-grafting operations; George Ness, 10, had second and third-degree burns over 38 percent of his body and also had two skin-grafting operations; Bill Holmes, 15, was burned over 15 percent of his body; and Laura Holmes, 5, had second and third-degree burns over 92 percent of her body—she died eighteen days after the accident.

Testing revealed unodorized gas escaping from the water heater. Testing of Holmes' control showed the knob was depressed in the ON position leaving the safety valve open and allowing gas to escape through the main burner. The soft plastic spline of the knob had been damaged and still had a shaving attached to it. Examination of the knob did not reveal *any* tool use.

Holmes and others brought suit against White–Rodgers, Smith, Wegman and several other defendants.[2] Following a month long trial in 1986,[3] the jury found White–Rodgers and Smith strictly liable and guilty of fraudulent concealment. The jury also found all remaining defendants guilty of negligence. The jury apportioned fault among the defendants and awarded compensatory damages of approximately $846,-000. The jury also awarded $2.5 million in punitive damages ($500,000 to each person injured or killed in the explosion) against White–Rodgers.

White–Rodgers claims (1) the record is insufficient to support (A) a judgment of fraudulent concealment, and (B) malice and punitive damages; (2) the recall campaign precludes punitive damages; (3) the jury instruction on deceit was erroneous requiring reversal of the punitive damage award; (4) the punitive damage award violates its due process rights, and (5) Wegman's conduct was an intervening superseding cause precluding a finding of negligence or strict liability against White–Rodgers.

*1. Sufficiency of the Evidence.*

White–Rodgers claims the record is insufficient to support a judgment of fraudulent concealment and contains insufficient evidence of malice to support an award of punitive damages.

> In resolving sufficiency of evidence issues on appeal, this court should examine the record to determine only if there is competent and substantial evidence to support the verdict. We resolve all conflicts and draw all reasonable inferences therefrom in favor of the prevailing party.

*Zee v. Assam*, 336 N.W.2d 162, 164–65 (S.D.1983) (citation omitted); *see also Hoffman v. Louis Dreyfus Corp.*, 435 N.W.2d 211, 213 (S.D.1989); *Johnson v. Kirkwood, Inc.*, 306 N.W.2d 640, 642 (S.D.1981); *State ex rel. Dept. of Transp. v. Richey Motor Co.*, 296 N.W.2d 505, 509 (S.D.1980).

A. Fraudulent Concealment.

■ The jury found White–Rodgers committed fraudulent concealment which was the proximate cause of the accident. *See* SDCL 20–10–2(3). White–Rodgers claims that there is no evidence of an express or implied statement or concealment by White–Rodgers with respect to Holmes prior to installation of the control. White–Rodgers further claims that because Holmes was not a residential LP gas user

---

**2.** The other defendants were involved with the production and delivery of the LP gas, which had not been properly odorized. These defendants settled prior to trial and are not parties to this appeal.

**3.** The appeal of this case was extensively delayed due to the death of the court reporter and the resulting difficulty in obtaining a trial transcript. During the delay, Holmes' lead trial counsel, Michael Pieplow, died and the trial judge, Irvin H. Hoyt, became a United States bankruptcy judge.

prior to 1983, she was not within any class to whom White–Rodgers owed any duty to warn about the control.

The record shows that as early as 1969, White–Rodgers knew that the control knob could stick when depressed as a result of shavings from the soft plastic spline. By July 1970, White–Rodgers knew the plastic could be shaved after turning the knob as few as 10 times. White–Rodgers improved the knob by using stronger plastic but made no effort to remedy the existing controls. In the early 1970's, White–Rodgers became aware of explosions, injuries and deaths due to damaged knobs, but approached these problems with "the foregone conclusion that we are not involved."

The knob was improved again in 1976, but still no effort was made to remedy the existing controls in use. During the time period in which these accidents occurred, White–Rodgers did not report them to the CPSC despite knowing that any substantial product hazard must be "immediately" reported. *See* 15 U.S.C. § 2064(b) (1988 & Supp. II 1990). White–Rodgers did not report to the CPSC until January 1980. After the recall was started, it failed to follow-up on unresponsive dealers, including Wegman. Therefore, there is competent and substantial evidence in the record that White–Rodgers suppressed facts as to the nature and potential hazards of the control.

■ White–Rodgers claims, however, that since the knob sold to Holmes was "used" and under recall, she was not within the class of persons it was required to inform. Privity is not a requirement in products liability actions premised on fraudulent concealment. *See Agristor Leasing v. Saylor*, 803 F.2d 1401, 1407 (6th Cir.1986) (citations omitted); *Woodward v. Dietrich*, 378 Pa.Super. 111, 548 A.2d 301, 311–16 (1988); *Driekosen v. Black, Sivalls & Bryson, Inc.*, 158 Neb. 531, 64 N.W.2d 88, 98 (1954); 2 American Law of Products Liability § 25:4 (Timothy E. Travers ed., 3rd ed. 1987).

One who practices a deceit with intent to defraud the public, or a particular class of persons, is deemed to have intended to defraud every individual in that class, who is actually misled by the deceit.

SDCL 20–10–3. As a member of the general public of potential LP gas users, Holmes was within the class of persons misled by White–Rodgers' fraudulent concealment.

■ White–Rodgers' recall campaign was a factor mitigating against fraudulent concealment. However, the warning or recall must be adequate to counter the effects of ten years of concealment to release White–Rodgers from liability. 2 American Law of Products Liability § 26:6. As noted above, White–Rodgers' recall campaign was designed to have LP gas dealers send in their customer lists. The success rate of this recall/warning was poor; the followup on unresponsive dealers ceased after reaching the letter "C"; and the recall notice itself implied that, absent damage to the knob, the control was safe—not that it contained a design defect and was unsafe. There are conflicts in the evidence, and it was the job of the jury to resolve those conflicts. *See Hoffman*, 435 N.W.2d at 215. The jury could have reasonably found that White–Rodgers committed fraudulent concealment as to Holmes.

### B. Malice.

■ White–Rodgers claims that, even if the record supports the fraudulent concealment verdict, the record contains insufficient evidence of malice to support an award of punitive damages. White–Rodgers claims that under SDCL 21–3–2, *Dairyland Ins. Co. v. Wyant*, 474 N.W.2d 514, 516 (S.D.1991); and *Dahl v. Sittner*, 474 N.W.2d 897, 900 (S.D.1991), malice is required before punitive damages can be awarded. Under SDCL 21–3–2, the jury may award punitive damages where the defendant was guilty of "oppression, fraud, *or* malice, actual *or* presumed." (Emphasis Added.)

Malice may be either actual or presumed. Actual malice is a positive state of mind, evidenced by the positive desire and intention to injure another, actuated by hatred or ill-will towards that person.... Presumed, legal malice ... is malice

which the law infers from or imputes to certain acts.

*Dahl,* 474 N.W.2d at 900 (citing *Hannahs v. Noah,* 83 S.D. 296, 303, 158 N.W.2d 678, 682 (1968)). White–Rodgers knew of the potential danger of explosion from the control knob for ten years prior to deciding to recall it. When White–Rodgers redesigned the knob in 1970 and again in 1976, no warnings were issued to those people who already owned the control. White–Rodgers instructed its personnel to address potential liability from these control explosions with "the foregone conclusion that we are not involved." It maintained this policy through 22 explosions, 5 deaths and 19 injuries despite knowledge of the potential dangers as early as 1969. When viewing the record most favorably to the verdict, there is evidence to support a finding of presumed malice sufficient to support punitive damages.

### 2. Recall Campaign.

■ White–Rodgers claims its recall campaign, begun prior to the Holmes incident, precludes an award of punitive damages. White–Rodgers further claims that a failure to hold that recall programs prohibit punitive damages as a matter of law will discourage responsible conduct by manufacturers and would be against public policy.

As discussed in issue 1(A), the recall campaign was a factor mitigating against a finding of fraudulent concealment. Whether the recall was adequate to counter the fraudulent concealment was a question for the jury. The jury determined that the recall was insufficient to prevent a verdict of fraudulent concealment, and as stated in issues 1(A) and 1(B), there was sufficient evidence to support the jury verdict. We are not ruling that a prompt, effective recall will never prohibit punitive damages, but simply that, under these facts and circumstances, White–Rodgers delay in recall-

ing the control and its handling of the recall does not prohibit an award of punitive damages. *See John Deere Co. v. May,* 773 S.W.2d 369, 378–79 (Tex.Ct.App.1989). Therefore, we are unwilling, under these facts, to hold as a matter of law that White–Rodgers' recall prohibited an award of punitive damages.

### 3. Jury Instruction 32 on Deceit.

■ White–Rodgers claims the punitive damage award must be reversed because it resulted from an erroneous jury instruction on deceit. Jury instructions must be considered as a whole and will not be considered erroneous if, when considered together, they sufficiently and correctly state the applicable law. *See Kaarup v. Schmitz, Kalda and Assocs.,* 436 N.W.2d 845, 849 (S.D.1989); *Black v. Gardner,* 320 N.W.2d 153, 160 (S.D.1982); *Jahnig v. Coisman,* 283 N.W.2d 557, 560 (S.D.1979).

The law supporting instruction 32 was agreed to and settled on by the parties. The instruction was intended to be a verbatim statement of SDCL 20–10–2, which provides in part:

The suggestion, as a fact, of that which is not true, by one who does *not* believe it to be true[.]

(emphasis added). Instead, instruction 32 stated in part:

(1) The suggestion, as fact, of that which is not true, by one who does believe it to be true[.]

The omission of the word "not" was a clerical error caused by Holmes' counsel or their clerical staff. White–Rodgers claims this instruction allowed the jury to find it guilty of the intentional tort of deceit even if the jury believed that White–Rodgers had been merely negligent.

The main thrust of Holmes' argument and evidence for liability was to SDCL 20–10–2(3), fraudulent concealment, not to SDCL 20–10–2(1), fraudulent statement.[4]

---

**4.** SDCL 20–10–2 states:
A deceit within the meaning of § 20–10–1 is either:
(1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

(2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;
(3) The suppression of a fact by one who is bound to disclose it, or who gives information

Although subsection (1) of instruction 32 was in error, the remainder of instruction 32 correctly defined deceit under SDCL 20–10–2(3)—"the suppression of a fact by one who is bound to disclose it[.]" The jury found White–Rodgers committed fraudulent concealment. Therefore, when viewing the jury instructions as a whole and in light of the jury verdict of "fraudulent concealment," as opposed to fraudulent statement, the omission of the word "not" from instruction 32 is not shown to be prejudicial error.

### 4. Due Process.

■ White–Rodgers claims the award of punitive damages violates its due process rights under the Constitutions of the United States and South Dakota. White–Rodgers reserved its motions following the close of Holmes' case and made its motion for directed verdict at the close of all evidence. However, White–Rodgers failed to assert as grounds for its directed verdict motion, that a punitive damage award would be in violation of its due process rights under the Constitutions of the United States and South Dakota. That argument was raised for the first time in its motion for judgment n.o.v.

> Because a motion for judgment n.o.v. is technically only a renewal of the motion for directed verdict, it cannot assert a new ground for relief. If [White–Rodgers] hoped to prevail on this alternative theory, it should have made certain to assert it at the close of the evidence. Having failed to do so, [White–Rodgers] was precluded from raising the point for the first time in its motion for judgment n.o.v., and it certainly cannot advance the argument here.

*Heller v. Champion Intern. Corp.*, 891 F.2d 432, 436 (2nd Cir.1989) (citations omitted). *See also* 9 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2537 (1971 & Supp.1992). Therefore, despite raising this issue in its motion for judgment n.o.v., White–Rodgers failed to preserve this issue on appeal.

### 5. Superseding Cause.

■ White–Rodgers claims the conduct of Wegman in selling and installing a recalled control constituted a superseding cause relieving it of liability for damages to Holmes. Whether or not certain conduct constitutes a superseding cause and questions of proximate cause are normally for the jury. *See Raebel v. Fishers Grove Golf Course, Inc.*, 88 S.D. 20, 22, 214 N.W.2d 785, 786 (1974); *see also* 1 American Law of Products Liability §§ 4.7, 4.9, 4.16. It is a question of law for the court only where the facts are not in dispute and reasonable minds could not differ. As noted in issue 1, this Court reviews the evidence most favorably to support the jury verdict. *Raebel*, 88 S.D. at 22, 214 N.W.2d at 786. Wegman was aware of, *but apparently forgot* about the recall at the time he sold and installed the control on Holmes' water heater. The jury found that Wegman's actions did not break the causal connection between White–Rodgers manufacturing the control, its ten-year knowledge of the potential dangers of explosion, its lengthy delay prior to recalling the control and its failure to follow-up on known lapses in the recall campaign. Viewing the evidence under the above guideline, reasonable minds could differ whether Wegman's actions constitute a superseding cause. The conflicts must be resolved by the jury and they have done so against White–Rodgers. We find no error and we affirm.

WUEST and HENDERSON, JJ., concur.

MILLER, C.J., and AMUNDSON, J., concur specially.

AMUNDSON, Justice (concurring specially).

This case could have caused considerable uncertainty on the issue of intervening cause based on the conduct of defendant, "Forgetful Herb Wegman." There is no question that this individual was involved in the recall of the White–Rodgers thermostatic control and did replace sixteen of

of other facts which are likely to mislead for want of communication of that fact; or

(4) A promise made without any intention of performing.

these controls under the program, including his own and his son's. Notwithstanding this involvement in the recall program, Wegman installed a used White–Rodgers control on the Holmes heater in order to make $25.00. This was after this salvaged control had been carried in the back of his truck for two to three years. There is no question in my mind nor in the jury's mind that Herb was negligent. On the other hand, was his negligence sufficient to absolve White–Rodgers from any liability for putting this defective control in the stream of commerce?

The trial court instructed the jury in Instruction No. 9 as follows:

> When the expression "intervening cause" is used, it means the natural and continuous sequence of causal connection between the negligent conduct and the injury as interrupted by a new and independent cause, which itself produces the injury. An intervening cause operates to relieve the original wrongdoer of liability. The intervening cause must be a superseding cause. It must so entirely supersede the operation of the defendant's negligence that it alone, without his negligence contributing thereto, produces the injury.

The record reflects that no objection was made to this instruction. Appellant White–Rodgers also does not argue that this was an erroneous statement of the law.

White–Rodgers does argue that it could not foresee this type of conduct on the part of Wegman. That could be a good issue had it been raised below. As stated by Prosser & Keeton, The Law of Torts § 44, pp 311–12 (5th ed. 1984):

> [O]nce the defendant's negligence is established because injury of some kind was to be anticipated, intervening causes which *could not reasonably be foreseen,* and which are no normal part of the risk created, may bring about results of an entirely different kind.
>
> It is here at least that the line is drawn to terminate the defendant's responsibility. The courts have exhibited a more or less instinctive feeling that it would be unfair to hold the defendant liable. The

virtually unanimous agreement that liability must be limited to cover only those causes which lie within the scope *of the foreseeable risk* ... is based upon a recognition of the fact that the independent causes which may intervene to change the situation created by the defendant are infinite, and that as a practical matter responsibility simply cannot be carried to such lengths. (Emphasis added.)

Further, this court recently adopted the foreseeability requirement in *Musch v. H–D Coop., Inc.,* 487 N.W.2d 623, 626 (S.D. 1992), which was obviously decided long after this case was tried. It still remains that White–Rodgers did not propose any instruction on the foreseeability of Wegman's conduct as a factor which could end its liability in this case.

The Nebraska Supreme Court in *Brown v. Nebraska Pub. Power Dist.,* 209 Neb. 61, 306 N.W.2d 167 (1981), in overruling a summary judgment involving a claimed intervening cause defense, stated:

> "Generally, the effect of an intervening negligent act is tested by determining whether it was such as might reasonably have been foreseen as a consequence of the claimed negligence of the original actor.... The law does not require precision in foreseeing the exact hazard or consequence which happens. It is sufficient if what occurs is one of the kind of consequences which might reasonably be foreseen. The question whether negligence is, in view of the intervening negligence of a third person, such a continuing and substantial factor in producing an accident as to be a proximate cause of the injury, *is a question of fact,* rather than a question of law." (Emphasis added.)

*Id.* 306 N.W.2d at 171 (quoting *Libbey–Owens Ford Glass Co. v. L & M Paper Co.,* 189 Neb. 792, 205 N.W.2d 523, 529 (1973)).

This fact question was decided adversely to White–Rodgers by the jury. Although I feel the instructions on this issue could have had more meat, "foreseeability," on the bone, the appellant failed to provide the meat to the trial court on the foreseeability

issue. Therefore, I reluctantly concur in the majority writing in this case. To hold otherwise would require this court to get into the jury box, which appellate courts should refrain from doing.

I am authorized to state that Chief Justice MILLER joins in this special concurrence.